**CITY OF ROME, et al., Plaintiffs,**

v.

**Richard A. GLANTON, et al., Defendants**

v.

**Francesco RUTELLI, et al., Third–Party Defendants.**

**Civil Action No. 96–5284.**

United States District Court,
E.D. Pennsylvania.

April 15, 1997.

James E. Beasley, Michael A. Smerconish, Beasley, Casey and Erbstein, Philadelphia, PA, for Plaintiffs.

Robert J. Sugarman, Noreen O'Grady, Sugarman & Associates, Philadelphia, PA, Barbara W. Mather, Pepper, Hamilton & Scheetz, Philadelphia, PA, Samuel E. Klein, Amy B. Ginensky, Dechert, Price & Rhoads, Philadelphia, PA, for Defendants.

## ORDER AND MEMORANDUM

KATZ, District Judge.

**AND NOW**, this 15th day of April, 1997, upon consideration of plaintiffs' and defendants' Motions for Summary Judgment, and the responses and replies thereto, and after a hearing, it is hereby **ORDERED** that the said motions are **GRANTED**.

### I. *Factual Background*

While satellite disputes have not been lacking in the course of this litigation, the central dispute involves a potential exhibition of one of the most renowned art collections in the world. The Barnes Foundation was chartered in 1922, and between 1922 and 1992, the works in the collection did not travel outside the campus of the Foundation in Merion, Pennsylvania, at the express direction of its founder, Albert C. Barnes. On July 21, 1993, a ruling of the Montgomery County Orphans' Court permitted a one-time exhibition tour of select masterpieces from the Barnes Foundation to take place between April 1993 and September 1995, as part of an effort to raise funds to renovate the Barnes. After receiving court approval, the defendants assembled select works from the Foundation for a travelling exhibition entitled "From Cezanne to Matisse: Great French Paintings from the Barnes Foundation" (the "Exhibition"). The Exhibition was to conclude in April of 1995 at the Philadelphia Museum of Art, after which the collection was to return to its permanent venue, the Barnes.

In September 1992, one of the plaintiffs, Antonio Guizzetti, was introduced to defendant Richard Glanton, the President of the Barnes Foundation. Pl. Resp. Ex. A. In the months that followed, Guizzetti and Glanton had a number of conversations and an ongoing correspondence about Rome as a venue for the Exhibition. In the course of their conversations and correspondence, Glanton asked Guizzetti to assist him in being retained for legal business. Pl. Resp. Ex. B.

On January 12, 1994, Glanton wrote to Guizzetti and outlined the conditions required to bring the Exhibition to Rome:

[A] fee of $3 million, plus expenses related to travel and other incidental costs, in exchange for the loan of the paintings. The catalogue rights would have to be worked out with our publisher, Alfred A. Knopf, Inc., and we would be able to assist you in this regard.

At present, we are unable to conduct any negotiations on future decisions about additional venues because of the pending petition in the Orphans' Court of Montgomery County. . . .

Compl. Ex. D.

On December 2, 1994, Glanton wrote a letter to Guizzetti that included the following:

You asked that I confirm which certain conditions were mandatory in order for the Barnes Foundation to agree to this project. First, the exhibition would require a minimum of $3 million in cash payments to be made in three equal installments prior to the opening of the exhibition. Second, all related costs, such as travel insurance, packaging, and any other related expense would be the responsibility of the sponsors. Third, the exclusive merchandise rights could be granted to Marsilio Editore. However, catalogue rights would be subject to negotiations with Knopf. . . .

Pl. Resp. Ex. O.

On December 14, 1994, Glanton wrote another letter to Guizzetti following another conversation "concerning the prospects for the exhibition in Italy":

First, you requested that I reaffirm the fees required for the exhibition to occur, subject to Court approval. In response, this will confirm that the Foundation requires a fee of $3 million payable in advance in order for the exhibition to take place.

Secondly, you requested advice as to whether an Italian publisher could be permitted to publish a catalogue in connection with the exhibition. In this connection, I will make every effort to negotiate an agreement with Knopf. . . .

Pl. Resp. Ex. P.

Glanton toured the Museo Capitolino, the potential site of the exhibition, when he visited Rome in December of 1994. Pl. Resp. Ex. C; Compl. Ex. G. He returned to Rome in February, 1995, and was a guest of the City of Rome. Pl. Resp. Ex. D. Glanton once again toured the Museo Capitolino during his February, 1995 visit and met with various city officials. Pl. Resp. Exs. C, D. Glanton had concerns about the security available in the Museo Capitolino and mentioned certain aspects of his concerns to Guizzetti. Pl. Resp. Ex. C. Glanton met with Paulo Gentiloni, the Director of Communications, Guizzetti, Maurizio Venafro, another Roman official, and Gianni Borgna, the Cultural Minister, to discuss the terms for staging the Exhibition in Rome. Def. Resp. Exs. L, M; Pl. Resp. Exs. A, E, F. Glanton did not meet at length with the Mayor, who walked through at the end of the meeting and greeted Glanton briefly. Pl. Resp. Ex. E. Glanton dictated a letter that he requested the Mayor sign, which included the following statement:

The fee agreed upon is $3 million, payable in two installments. The initial payment shall be made upon the signing of the Agreement between the sponsors of the exhibition and The Foundation, and the balance shall be paid on or before the 21st of April, 1995.

Pl. Resp. Ex. G.

The Mayor then signed and faxed a letter that included the following:

This will confirm our discussions of today in which it was agreed that the city of Rome would enter into an Agreement with The Barnes Foundation, subject to the approval of the Orphans' Court of Montgom-

ery County, Pennsylvania, for the Exhibition of "Great French Paintings" from The Barnes Foundation, to be held in Rome beginning in April 1995. The fee agreed upon is $3 million, payable in two installments.

Pl. Resp. Ex. H.

On Monday, March 20, 1995, the Board of Trustees of the Barnes Foundation met and discussed, among other topics, potential venues for the Exhibition. Pl. Resp. Ex. Q. The minutes of the meeting state: "Mr. Glanton did not recommend Italy based on his visits and discussions with staff there. However, he felt that Munich's museum was first class and would do a very good job of mounting the exhibition." *Id.* On March 25, 1995, an article appeared in the Philadelphia Inquirer, which revealed the Board of Trustees' vote to stage the exhibition in Munich. Pl. Resp. Ex. J. Guizzetti saw the *Inquirer* article on March 27, 1995, and sent Glanton a fax marked "Urgent," asking that he and Glanton discuss "the misinformation being provided to my office, the city of Rome, and the *Philadelphia Inquirer.*" Pl. Resp. Ex. J. Guizzetti then called Glanton, who denied the proposed staging of the Exhibition in Munich and claimed that the news account was a racial attack. Pl. Resp. Ex. A. Glanton then faxed a copy of the petition to the Orphans' Court. Pl. Resp. Ex. L. The petition identified the requested additional venue only as "an additional premier art museum in Europe." Pl. Resp. Ex. L. Glanton did not communicate with the plaintiffs prior to March 27, 1995 about his change of mind, "for the reason that they were not in a position to make a commitment that we would accept . . . . they had not even met the minimal conditions that I had outlined to them, in terms of what would be required to execute an agreement to have an exhibition." Pl. Resp. Ex. C. The plaintiffs continued to prepare for the Exhibition prior to the Orphans' Court ruling. Pl. Resp. Ex. A.

The Barnes Foundation received Superior Court approval to stage one additional venue for the Exhibition, and the Exhibition toured the Haus der Kunst in Munich in October, 1995. The Haus der Kunst paid $2.15 million for the Exhibition. Pl. Resp. Ex. I. Plaintiffs filed this action. Count I is for breach of contract; Count II is for detrimental reliance; Count III is for breach of duty of good faith and fair dealing; Count IV is for fraudulent misrepresentation; Count V is for negligent misrepresentation; Count VI is for fraudulent concealment; and Count VII is for civil conspiracy. Plaintiffs have since indicated that they will not pursue the specific performance claim in Count VIII and that their claims against defendants Frank, Jackson, Sudarkasa, and Walker will be voluntarily dismissed, so the court will not address issues that relate to this count or to these defendants. *See* Def. Mot. for Summ. Judg. Ex. EE; Pl. Reply Ex. B; Stipulations of April 9, 1997. Defendants have filed a number of counterclaims and crossclaims as well: Count I is an abuse of process claim; Count II is a breach of good faith negotiation claim; Count III is for fraudulent misrepresentation; Count IV is for fraudulent misrepresentation; Count V is for libel and slander; Count VI is a RICO claim; Count VII is a claim for contribution. Defendants have stipulated to a dismissal of all counterclaims on behalf of defendants Sudarkasa and Jackson; the court will not address Count I or issues that relate to defendants Sudarkasa or Jackson. Both plaintiffs and defendants have moved for summary judgment.

## II. *Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn therefrom in favor of the non-moving party. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987); *Baker v. Lukens Steel Co.,* 793 F.2d 509, 511 (3d Cir.1986). In other words, if the evidence presented by the par-

ties conflicts, the court must accept as true the allegations of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

## III. *Discussion*

### A. *Choice of Law*

■ As a threshold matter, this court must determine the law that applies to the claims in this case. A federal court sitting in diversity applies the choice of law rules of its forum state. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *LeJeune v. Bliss–Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir.1996). Under Pennsylvania's choice of law rules, the court must first determine whether a false conflict or a true conflict exists. *LeJeune*, 85 F.3d at 1071. A false conflict exists if only one jurisdiction's interests are impaired by the application of the other jurisdiction's law, or if there is basically no difference between the laws of the jurisdictions. *See id.; Lucker Manufacturing v. Home Insurance Co.*, 23 F.3d 808, 813 (3d Cir.1994). If a true conflict exists, then this court must use Pennsylvania's choice of law analysis and apply the law of the jurisdiction with the greatest interest in the application of its laws. *See Lucker Manufacturing*, 23 F.3d at 813.[1] Italy's Code mandates a more restrictive interpretation of contract formation and the duties that attend such negotiations than Pennsylvania law. *See* F.R.C.P. 44.1; Affidavit of Avv. Mario Beltramo; Def. Mot. for Summ. Judg.

Ex. DD. Italy's system of tort recovery is more restrictive than Pennsylvania's. *See* John G. Culhane, *The Limits of Products Liability Reform Within a Consumer Expectation Model: A Comparison of Approaches Taken by the United States and the European Union*, 19 Hastings Int'l & Comp. L.Rev. 1, 23–50 (1995); Franco Ferrari, *Comparative Remarks On Liability for One's Own Acts*, 15 Loy. L.A. Int'l & Comp. L.J. 813 (1993). In this setting, both Italy and Pennsylvania have an interest in regulating torts and contracts that affect their own domiciliaries, as well as in controlling the outcomes that result from the conflicts between the organizing principles of their legal systems. In this situation, the court finds that a true conflict exists and that it must apply Pennsylvania's choice of law analysis.

Pennsylvania's choice of law analysis involves a hybrid of the most significant relationship test set forth in the Second Restatement of Conflict of Laws and Currie's governmental interest analysis. This approach applies to both tort and contract actions. *Melville v. American Home Assur. Co.*, 584 F.2d 1306, 1311–13 (3d Cir.1978); *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964).

■ As for the contract claims at issue,[2] a number of the relevant contacts occurred or would occur in Rome, as the site where the contract was to be performed, and as the site in which the bulk of the contract negotiations took place.[3] However, central to the parties'

1. Defendants insist that Italian law applies to the question of the existence of the contract, but that Pennsylvania law applies to all other legal questions in the case. Plaintiffs announced at the hearing that Italian law applies to defendants' libel and slander claims against Gianni Borgna, but they have argued throughout the course of this action that Pennsylvania law applies to the state law counts. The court sees no reason to disturb the parties' areas of agreement as to choice of law and will address only the choice of law issues that relate to the contract claims and the libel and slander counterclaim.

2. Defendants note that a court may apply the principle of depecage, or "piecemeal" analysis, to different choice of law issues. *See Broome v. Antlers' Hunting Club*, 595 F.2d 921, 924 (3d Cir.1979); *Kelly v. Ford Motor Co.*, 942 F.Supp. 1044, 1045 (E.D.Pa.1996); *see also Chemetron Investments v. Fidelity & Casualty Co.*, 886

F.Supp. 1194, 1199 (W.D.Pa.1994). This court's ultimate conclusion is that this doctrine is not warranted in this particular case.

3. The more specific provisions of the Second Restatement are not wholly on point for this type of contract, *see* Restatement (Second) of Conflict of Laws §§ 189–197, so this court has applied the more general provision, § 188(2), in which the relevant factors include: the place of contracting; the place of negotiation of the contract; the place of performance; the location of the subject matter of the contract; and the domicil, residence, nationality, place of incorporation and place of business of the parties. These factors are to be read in light of the factors in § 6(2): the needs of the interstate and international systems; the relevant policies of the forum and other interested states; the protection of justified expectations; policies underlying the particular

discussions and negotiations was the understanding that their agreement had to be approved by the Montgomery County Orphans' Court.[4] As a singular undertaking by the Barnes Foundation, the Exhibition was subject to number of legal proceedings in Pennsylvania before it could travel to a foreign venue. The interests of Pennsylvania in applying its own law, not only for its interest in the uniformity of the Orphans' Court's approval of the Exhibition in a variety of venues, but also for its interest in the Orphans' Court's ability to enforce and control the manner in which the Barnes and the City of Rome handled their proposal for the Exhibition, receive greater weight in this instance. As a result, for the counts that may be characterized as either contract or quasi-contract claims, and the issues therein, Pennsylvania law applies.

■ For the libel and slander counterclaims, Pennsylvania law applies. Defendant Glanton is a Pennsylvania domiciliary, and despite the international nature of these negotiations and this lawsuit, any harm to his professional and personal reputation that resulted from the allegedly defamatory statements occurred within this state.[5]

### B. *Defendants' Motion for Summary Judgment*

#### 1. *Introduction*

The contract claim in this case raises two difficult issues. How far should the legal system go to supply terms for parties to an enterprise who have failed to make their own provision? At what point in the resolution of that issue should a judge, rather than a jury, make the call?

My resolution of these issues turns this premise: the law requires a normative standard of what the parties mutually must resolve for themselves. There must be an objective demonstration of accord, concreteness, and predictability, before a fact finder may infer an enforceable contract.

Whether there was an enforceable promise for a promise is case specific. How central to the negotiation was the unresolved portion? How clear was the communication on the issues that were raised? Was there a meeting of the minds? The notions of offer, counteroffer, and acceptance are sometimes used as conclusory labels. The intent of the parties is a useful statement of the question, not necessarily the incantation for a jury trial. We should not reach conclusions by reifying fictions.

Every issue of degree is not, in itself, a genuine issue of fact. Rhetoric does not turn mole hills into mountains, and not all disputes are material.

In this case, what stands out is that Glanton, on behalf of the Barnes Foundation, came to Rome with, and never changed a proposition to supply an exhibition for $3 million payable *in advance*. For whatever subjective reasons, the Mayor of Rome, after Glanton left, unilaterally struck the provision

---

field of law; certainty, predictability, and uniformity of result, and ease in the determination and application of the law to be applied. *See also Knauer v. Knauer,* 323 Pa.Super. 206, 470 A.2d 553, 557–58 (1983).

**4.** As plaintiff notes, contracts for the other foreign venues for the Exhibition contained choice of law clauses for Pennsylvania law, so the application of foreign law to the "agreement" the parties reached regarding the proposed Rome Exhibition would be an anomaly. Pl. Resp. Ex. N.

**5.** The parties agree that Pennsylvania law applies to the libel and slander claims involving plaintiff Guizzetti's comments in the Philadelphia *Inquirer,* and the court agrees with their contentions. Their area of disagreement involves statements made to an Italian newspaper, *La Repubblica.*

Defendant Glanton claims that the statements in question were published in both Italy and Pennsylvania.

Section 150 of the Second Restatement includes the following:
(1) The rights and liabilities that arise from defamatory matter … are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
(2) When a natural person claims that he has been defamed by an aggregate communication, the state of the most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.
As defendant Glanton is a Pennsylvania domiciliary, § 150(2) indicates that Pennsylvania law applies to defendant Glanton's claims.

in Glanton's proposition that the $3 million would be paid *in advance*. For whatever reasons, the exhibition went to Munich. Why should the law permit a finding that this disagreement constituted an enforceable contract?

One can speculate that the Barnes Foundation controlled the paintings and that the parties might have resolved the matter of payment themselves. But the reality remains that they did not. Ultimately, I would leave the market to regulate this level of sharp dealing. Not all betrayal is a tort.

### 2. Breach of Contract, Promissory Estoppel, Breach of Good Faith Negotiation

#### a. Lack of Mutual Assent

■ The plaintiffs' contract claim fails because there was no contract to breach. Specifically, plaintiffs cannot establish a meeting of the minds on when the $3 million would be paid. The Mayor's letter of February 8, 1995 simply stated: "The fee agreed upon is $3 million, payable in two installments." Mr. Glanton's draft letter of Feb. 6, 1995 provided: "The fee agreed upon is $3 million, payable in two installments. The initial payment shall be made upon the signing of the Agreement between the sponsors of the exhibition and the foundation, and the balance shall be paid on or before the 21st of April, 1995." The materiality of the advance payment of the $3 million was made clear in Glanton's letter to Guizzetti of December 14, 1994.

The testimony confirms the lack of mutual assent. Guizzetti testified that there was no discussion between the parties regarding the time of payment of the three million dollars. Def. Reply, Ex. A at 340. Venafro confirmed that the Mayor of Rome deleted the lines of Glanton's draft letter that called for payment in advance. *Id.* Ex. E at 53–54. The Mayor of Rome did not recall any negotiations that resolved the issue of when payment would be made. *Id.* Ex. G. Gentiloni testified that Guizzetti was not authorized to represent the City of Rome in negotiating the contractual arrangements, and that the parties did not reach any resolution as to when the $3 million would be paid. *Id.* Ex. H at 19, 22, 23, 35–36. Borgna did not recall any discussions about when the $3 million would be paid. *Id.* Ex. J at 101–02. The president of Marsilio Editore, Cesare De Michelis, testified to the absence of a fundamental agreement. *Id.* Ex. R at 45–46.

Given the absence of an agreement on an essential term, there was no binding contract under Pennsylvania law and, *a fortiori*, under the more demanding requirements for a contractual obligation under Italian law.[6] Conclusory opinions and contentions to the contrary are not a substitute for evidence from persons having firsthand knowledge of the facts. The fact that Gentiloni, Glanton, and the others agreed on the wording of the letter does not say the parties agreed on a contract. No evidence is presented that they agreed to leave the terms of payment open. The evidence is that they disagreed on the terms of payment. If they agreed to leave the terms of payment open, the law would supply the term that the $3 million would be paid within a reasonable time. If they did not so agree, the letter was not a contract. The objective manifestations of intent do not give rise to a genuine issue of material fact; there was no deal, no intention to be bound, no seriousness. It was a world of game playing, not deal making. It was not commercially reasonable for Rome to spend one lira given what it knew of the deal. The deal was gossamer. Nor was it reasonable for Glanton to spend the Foundation's money, given Guizzetti's grandiosity and Rome's lack of commitment.

Mr. Gentiloni offers no explanation for why the terms of payment were deleted from the Mayor's letter. He doesn't remember. *Id.* Ex. H at 41–42. This is hardly evidence that the parties resolved their disagreement on those terms. In *Channel Home Centers v. Grossman*, 795 F.2d 291, 298–300 (3d Cir. 1986), on which plaintiffs rely, there was an agreement to negotiate in good faith. This record contains no evidence that the parties mutually intended to enter into such a binding agreement. The failure to resolve the advance payment issue left the negotiations without sufficient specificity to make their

---

6. *See* Affidavit of Avv. Mario Beltramo, Exs. A, B.

preliminary negotiations an enforceable contract. There is no evidence the parties intended Rome's payment of $3 million and the pictures to go to Rome to be enforceable promises, given the state of the summary judgment record. There is no evidence that both parties manifested an intention to be bound by the Mayor's letter. At most there was an agreement to agree, not a closed proposition. Leaving open when Rome would pay the $3 million left the terms of the deal not sufficiently definite to be enforced. The Mayor's letter and the surrounding circumstances suggest the parties formulated a prelude to a lawsuit, not a mutually binding commitment.

The Mayor's statement that his letter constitutes an agreement is a legal view not shared by this court. *See* Pl. Mot. Ex. B at 38–39. The letter does not look like an agreement, and to say, as the Mayor does, "[i]f you change your ideas, you have to pay," expresses anger and a feeling of betrayal, but does not supply a contract term over which the parties did not agree, namely, when to pay. *See id.* at 38. To say one should pay for betrayal is different from saying one should pay damages for breach of contract.

At most the parties agreed to agree on the terms of payment after the Barnes obtained Orphans' Court approval of the exhibition in Rome. The Barnes betrayed this agreement by taking the exhibition to Munich. The letter that the Mayor of Rome signed was not a contract, even assuming the parties agreed on its wording. The circumstances surrounding the Mayor's letter in their totality do not demonstrate a meeting of the minds on the terms of payment, which were both material and disputed. To say that the law should supply the missing term by requiring payment within a reasonable time would be to write a contract for the parties which they did not make themselves.

The undisputed facts are that the time when payment would be made was unsettled. One alternative is to instruct a jury that in the absence of agreement over the terms of payment, there is an implied condition that payment is to occur upon completion of the exhibition. *See Ingrassia Const. Co., Inc. v.*

*Walsh,* 337 Pa.Super. 58, 486 A.2d 478, 484 (1984). In a different contractual context, another alternative is to instruct a jury that, absent such agreement, payment was due within a reasonable time. *See, e.g.,* P.L.E. (Contracts) § 271. Such dispositions would be troublesome in view of the undisputed facts that Barnes wanted advance payment and Rome deleted that language from the Mayor's letter. As Professor Corbin writes:

> A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract. They must have expressed their intentions in a manner that is capable of being understood. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of any enforceable contract.

1 Arthur Corbin, *Corbin on Contracts* § 4.1, at 525 (Rev. ed.1993). This court cannot determine what the contract is with regard to payment. The undisputed facts are that the parties reached no agreement on this point. Is it commercially reasonable for a court to allow a jury to fix terms of payment on a $3 million executory contract for an international art exhibit between relatively sophisticated parties with access to counsel where the parties have not done so? The claim for specific performance is withdrawn; but were it not, should a court order the exhibition to Rome and leave payment open for an unspecified reasonable time in the future? I think the better course is to leave the parties where they left matters themselves: open and disputing on a term vital to agreement and, therefore, without a contract.

As Professor Corbin posed the difficult issue:

> *Courts do not make contracts.* Courts have often said that they do not make contracts for the parties, very often in cases in which they wash their hands of a difficult problem that is thrust upon them

by reason of incompleteness or indefiniteness in the expression of some term in a written instrument by which the parties clearly intended to be bound. They may be quite justified in this, for the matter is one of degree, but it is otherwise if the case is one in which other courts, on closely similar facts, have gone farther afield in the search for intention and have been able to overcome the indefiniteness of expression and to effectuate the purposes for which the instrument was executed. In this process, the latter courts can correctly say that they 'do not make a contract for the parties' but merely determine the just legal effect of the contract that the parties made.

*Id.* at 529.

This court finds the just legal effect to be to leave the parties with their quarrel about the terms of payment, not a contract.

There is ample authority for rejecting a contract where the parties have, on the undisputed facts, failed to agree on the terms of payment. As Professor Corbin says:

Frequently the price is agreed upon but the terms of payment are left to be agreed upon later. Many cases have found that such an agreement is fatally defective.

*Id.* § 4.3 at 579.

### b. *No Acceptance of Counteroffer by Defendant Glanton*

■ Plaintiffs argue in the alternative that even if the Mayor's letter could be considered a counteroffer, that 1) the question of whether a reply is an acceptance or a counteroffer is a question for the jury, and 2) Glanton's behavior in March acted as an acceptance of that offer. If there is a genuine dispute about whether the Mayor's letter was an acceptance or a counteroffer, the question is for the jury. *See Honeywell v. American*

*Standards Testing Bureau,* 851 F.2d 652, 659 (3d Cir.1988). Here there is no genuine dispute as to whether the Mayor's letter changed the terms Glanton proposed. As the court said in *Honeywell,*

The common-law rule is that a reply to an offer which purports to accept but is conditioned on the offeror's assent to term ... different from those offered is not an acceptance but is a counter-offer.

*Id.; see also Accu-Weather, Inc. v. Thomas Broadcasting Co.,* 425 Pa.Super. 335, 625 A.2d 75, 77 (1993).

■ If the mayor's letter can be characterized as a counteroffer, it was not accepted by Glanton's silence to Borgna's letter. Silence or inaction does not constitute acceptance in the absence of a duty to speak, and the facts of this case do not indicate such a duty existed. *Johnston the Florist, Inc. v. TEDCO Const. Corp.,* 441 Pa.Super. 281, 657 A.2d 511, 516 (1995); *Chorba v. Davlisa Enterprises, Inc.,* 303 Pa.Super. 497, 450 A.2d 36, 39 (1982). Nor does Glanton's conduct constitute acceptance; his untruthfulness about asking for court approval to send the exhibition to Munich might, on a different record, constitute some basis for tort recovery, but it does not create a question of material fact for plaintiffs' breach of contract claims. *See Accu–Weather,* 625 A.2d at 78.

### c. *Promissory Estoppel*

■ While plaintiffs also assert arguments involving promissory estoppel, these arguments are unavailing. A promise will be enforced, if the following elements exist: 1) a promise to a promisee; 2) which the promisor should reasonably expect will induce action by the promisee; 3) which does induce such action; and 4) which should be enforced to prevent injustice to the promisee. *See C & K Petroleum Prods., Inc. v. Equibank,* 839 F.2d 188, 192 (3d Cir.1988).[7] It was not

---

7. The defendants assert that the appropriate burden of proof for plaintiffs' promissory estoppel claim is the version used by some of our district courts; this approach rests on the premise that promissory estoppel is a variant of equitable estoppel and should be proven by clear and convincing evidence. *See Jersey Const., Inc. v. Pennoni Assoc., Inc.,* No. Civ. A. 91–7331, 1993 WL 29999 (E.D.Pa. Feb.4, 1993), *aff'd,* 8 F.3d 811

(3d Cir.1993); *Josephs v. Pizza Hut of America, Inc.,* 733 F.Supp. 222, 223–24 (W.D.Pa.1989), *aff'd,* 899 F.2d 1217 (3d Cir.1990). This court has chosen not to follow this approach, given the somewhat conflicting approaches to promissory and equitable estoppel taken by the Pennsylvania Supreme and Superior Courts. *See Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc.,* 535 Pa. 469, 636 A.2d 156,

reasonable for plaintiffs to rely on Mr. Glanton's statements, given the level of uncertainty about the terms of payment for the exhibition in Rome. Nor was it reasonable to rely on Mr. Glanton's forwarding Mr. Guizzetti a copy of the petition requesting permission for the Barnes to accept "an opportunity to receive an additional $2,500,000 for exhibition of works of art at an additional premier art museum in Europe," since the terms described differ from those set forth in the Mayor's letter providing for $3 million to be paid at an unspecified time.

#### d. *Duty of Good Faith and Fair Dealing*

 Every contract imposes upon the parties a duty of good faith and fair dealing in the performance and enforcement of the contract. *Liazis v. Kosta, Inc.,* 421 Pa.Super. 502, 618 A.2d 450, 454 (1992), *alloc. den.,* 536 Pa. 630, 637 A.2d 290 (1993); Restatement (Second) of Contracts § 205. The duty of good faith has been defined as "honesty in fact in the conduct or transaction concerned." *Somers v. Somers,* 418 Pa.Super. 131, 613 A.2d 1211, 1213 (1992). The obligation to act in good faith in the performance of contractual duties varies somewhat with the context and is impossible to define completely, but it is possible to recognize certain strains of bad faith which include: evasion of the spirit of the bargain; lack of diligence and slacking off; willful rendering of imperfect performance; abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. *Id.* Absent a contract, however, there is no breach of the duty of good faith and faith dealing, and plaintiffs have not met their burden in the first instance, so the court cannot allow this count to stand.

#### 3. *Fraudulent Misrepresentation*

 A party asserting a claim of fraudulent misrepresentation must establish five elements by clear and convincing evidence: 1) a misrepresentation; 2) a fraudulent utterance thereof; 3) an intention by the maker that the recipient will thereby be induced to act; 4) justifiable reliance by the recipient upon the misrepresentation and 5) damage to the recipient as the proximate result. *Delahanty v. First Pennsylvania Bank,* 318 Pa.Super. 90, 464 A.2d 1243, 1252 (1983). Given the absence of an agreement on material terms, plaintiffs have not demonstrated justifiable reliance on misrepresentations by Glanton that have been the proximate cause of injury to them. Nor have the plaintiffs demonstrated that Glanton's alleged misrepresentation after the March 17, 1995 *Inquirer* article was the proximate cause of any injury to them. Accordingly, summary judgment is entered on this count as well.

 Plaintiffs allege fraudulent concealment on the part of defendant Glanton and the Board through failure to disclose their negotiations with Munich and the Haus der Kunst. The elements for the tort of intentional non-disclosure are basically the same as that of fraudulent misrepresentation; however, there can be no liability for fraudulent concealment absent some duty to speak. *Duquesne Light Co. v. Westinghouse Electric Corp.,* 66 F.3d 604, 611–12 (3d Cir.1995); *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 n. 12 (1994); *In re Estate of Evasew,* 526 Pa. 98, 584 A.2d 910, 913 (1990). A duty to speak arises when one party is in a fiduciary or confidential relationship to the other. *Duquesne,* 66 F.3d at 612; *Evasew,* 584 A.2d at 912–13. Aside from the more well-known examples of a confidential relationship—such as the fiduciary relationship between an attorney and her client, or a guardian and her ward—a confidential relationship arises when the relative position of the parties results in a situation in which one party has power and means to take advantage of or exercise undue influence over the other. *Evasew,* 584 A.2d at 913.

 A duty to speak may also arise as a consequence of an agreement between parties, or as a result of one party's reliance on the other's representations, if one party is the only source of information to the other party, or the problems are not discoverable

---

159–60 (1994); *Straup v. Times Herald,* 283 Pa.Super. 58, 423 A.2d 713, 719–20 (1981); *see also Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 416 (3d Cir.1990); *but see Business Growth, Inc. v. Woodland Marble and Tile Co.,* 443 Pa. 281, 278 A.2d 922, 926 (1971).

by other reasonable means. A duty to speak may also occur when disclosure is necessary to prevent an ambiguous or partial statement from being misleading; where subsequently acquired knowledge makes a previous representation false; or where the undisclosed fact is basic to the transaction. *Duquesne,* 66 F.3d at 612–13; Restatement (Second) of Torts § 551. However, a duty to speak does not arise when both a plaintiff and defendant are sophisticated business entities, entrusted with equal knowledge of the facts and equal access to legal representation. *Duquesne,* 66 F.3d at 613.

■■■ The plaintiffs have not raised a genuine issue as to whether Glanton stood in a confidential or fiduciary relationship to them. The parties here had ample negotiating skills and access to legal representation, and the plaintiffs have not demonstrated that Glanton or the Board of the Barnes Foundation exercised some form of undue influence over them or had a heightened duty toward them.

Defendant Glanton and plaintiff City of Rome were parties of roughly equal business sophistication with access to legal representation, and the plaintiffs have set forth any legal authority that creates an exception to the general rule that mere silence is not sufficient absent a duty to speak. These parties had equal knowledge of the facts about whether a contract existed between the Barnes and Rome, and Glanton's silence about subsequent events was not a proximate cause of Rome's professed injury.

### 4. Negligent Misrepresentation

■■■ The elements of negligent misrepresentation are: 1) a misrepresentation of a material fact; 2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity, or must make the representation under circumstances in which he ought to have known of its falsity; 3) the representor must intend the representation to induce another to act on it; and 4) injury must result to the party acting in justifiable reliance on the misrepresentation. *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 890 (1994). Negligent misrepresentation differs from intentional misrepresentation in that the speaker does not have to know that his

words are untrue, but instead has not made a reasonable investigation of the truth of those words. *Id.* The parties set forth no contentions in their proffers regarding the negligent misrepresentation claim. The court rejects it.

### C. *Plaintiffs' Motion for Summary Judgment*

#### 1. *Additional Discovery Pursuant to Rule 56(f)*

Pursuant to Rule 56(f), defendants have requested that the court not decide plaintiffs' motion, due to what they perceive as a need for additional discovery. Def. Resp. Ex. KK. A 56(f) affidavit must specify what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained. *See Dowling v. City of Philadelphia,* 855 F.2d 136, 139–140 (3d Cir.1988). While 56(f) motions are usually granted when the information sought is in the exclusive control of the party seeking summary judgment, this rule is not absolute. *See Mid–South Grizzlies v. National Football League,* 720 F.2d 772, 779–80 (3d Cir.1983). A court may deny a continuance of discovery when a party's motion is based on speculation or raises merely colorable claims, when the party has already had an adequate opportunity to discover the information, or when the discovery requests themselves are irrelevant. *See Mid–South Grizzlies,* 720 F.2d at 781; *Jeffries v. Deloitte Touche Tohmatsu Int'l,* 893 F.Supp. 455, 458 (E.D.Pa.1995); *Clarke v. Mellon Bank,* Civ. A. No. 92–4823, 1993 WL 170950 at *6–*7 (E.D.Pa. May 11, 1993); *Paravati v. Bell Asbestos Mines,* Civ. A. No. 85–0021, 1986 WL 4535 at *1–*2 (E.D.Pa. April 16, 1986).

■■■ In their affidavit, defendants claim that their diligence has been frustrated by plaintiffs' resistance to the production of discoverable information, and that the fraud and RICO counterclaims require further discovery. Def. Resp., Ex. KK. Defendants have not set forth reasons sufficient to justify a continuance to permit further discovery on these counts or on any other counterclaim issues. Defendants have had more than ade-

quate time for discovery, and a large record has been produced to date on both plaintiffs' and defendants' claims. The court has mediated the discovery disputes that have occurred and has attempted to accommodate both the defendants' and the plaintiffs' discovery requests. Last-ditch efforts to obtain discovery do not qualify as adequate diligence in the eyes of this court. *See* Order of March 21, 1997. Accordingly, the court finds that the defendants have not set forth reasons sufficient to preclude this court's consideration of the plaintiffs' motion for summary judgment.

### 2. *Breach of Good Faith Negotiation*

■■■ Defendants also claim that if any contract occurred, the plaintiffs breached their duty to negotiate that contract in good faith. Counterclaim Count II, ¶ 7. Good faith in the bargaining or formation stages of the contracting process is distinguishable from the common law duty to perform in good faith. *Channel Home Centers v. Grossman*, 795 F.2d 291, 299 n. 8 (3d Cir.1986). A breach of good faith negotiation claim can result from an enforceable agreement to negotiate in good faith under Pennsylvania law. *Id.* at 298–99. The record available does not demonstrate a factual issue of whether an agreement to negotiate in good faith existed, nor does it demonstrate any breach of a common law duty to perform the contract in good faith, as this court has found that no contract exists. As a result, summary judgment is granted on this count.

### 3. *Fraudulent Misrepresentation*

Defendants also assert a claim for fraudulent misrepresentation. As stated above, a party asserting a claim of fraudulent misrepresentation must establish five elements by clear and convincing evidence: 1) a misrepresentation; 2) a fraudulent utterance thereof; 3) an intention by the maker that the recipient will thereby be induced to act; 4) justifiable reliance by the recipient upon the

misrepresentation; and 5) damage to the recipient as the proximate result. *Delahanty v. First Pennsylvania Bank*, 318 Pa.Super. 90, 464 A.2d 1243, 1252 (1983).

Defendants allege that Guizzetti misinformed both Glanton and the Barnes Foundation that he had made arrangements with cities in Italy and with others, that he was authorized to speak for these entities, and that a commitment of $3 million would be paid in substantial part at the signing of the agreement. Def. Resp. Ex. A. To underscore their claims, they point to deposition testimony in which Guizzetti testifies that he "exaggerated" the nature of his conversations with the potential sponsor of the Exhibition, ENI, and that he did so as a means of "pressuring Mr. Glanton." Def. Mot. Ex. T.

■■■ Despite their efforts, defendants have not established a genuine issue as to how they were harmed or how they acted in reliance on Guizzetti's actions. Defendants' counterclaim for fraud against Guizzetti falters on the unreasonableness of their reliance on Guizzetti's misrepresentations given the amorphous status of the deal with Rome.

In Count IV, defendants claim that Rutelli, Borgna, and Gentiloni defrauded them by stating falsely that a letter was from the Mayor of Rome and that they had a commitment from a sponsor, and that Guizzetti was a respected financier. Counterclaim Count IV, ¶¶ 29–32.[8] On the record at hand, defendants have not created a question of fact regarding the material falsity of this alleged activity, or the reasonableness of their reliance on such allegations. Accordingly, summary judgment is entered on Counts Three and Four as well.

### 4. *Libel and Slander*

In Count V, defendant Glanton asserts that Gianni Borgna defamed him by referring to him as a "con man" in an article in *La Repubblica*, an Italian newspaper, and that these comments were distributed in Philadel-

---

**8.** Defendants assert this claim against Rutelli, Borgna, and Gentiloni but also assert that their claim stands against all of the plaintiffs. Counterclaim Count IV, ¶¶ 29–32. Third Circuit case law indicates that under Rule 13(h), a counterclaim or cross-claim may not be directed exclu-

sively against non-parties, but that joinder under Rule 20(a) must include at least one existing party. *See F.D.I.C. v. Bathgate*, 27 F.3d 850, 872–74 (3d Cir.1994); *see also* 4 James Wm. Moore et al., *Moore's Federal Practice*, § 20.02(2)(b)(i) (3d ed.1997).

phia.[9] He also claims that plaintiff Guizzetti and certain Roman officials defamed him through comments made to the *Philadelphia Inquirer.*

■ Whether defendant Glanton is a public figure is a question of law to be determined initially by the court. *Marcone v. Penthouse Int'l Magazine for Men,* 754 F.2d 1072, 1081 (3d Cir.1985). Defendant Glanton has not developed "such pervasive notoriety in the community that he should be deemed a public figure for all purposes." *Id.* at 1082. However, as a result of his role as the President of the Barnes Foundation at the time of the well-known and widely celebrated tour of the Exhibition, defendant Glanton is deemed a limited purpose public figure for this court's analysis of the libel and slander counterclaims.

As a result of his status as a limited purpose public figure, the counterclaim must be analyzed along both state and federal law lines: 1) whether the counterclaim defendants have harmed Glanton's reputation within the meaning set forth by Pennsylvania law, and 2) if so, whether the First Amendment precludes recovery. *Id.* at 1077.

■ The burden of proof for a defamation cause of action is set forth in 42 Pa. Cons.Stat. Ann. § 8343(a):

1) The defamatory character of the communication;

2) Its publication by the defendant;

3) Its application by the plaintiff;

4) The understanding by the recipient of its defamatory meaning;

5) The understanding by the recipient of it as intended to be applied to the plaintiff;

6) Special harm resulting to the plaintiff from its publication;[10]

7) Abuse of a conditionally privileged occasion.

■ Under Pennsylvania law, the court must determine, in the first instance, whether the statements of which Glanton complains are capable of a defamatory meaning. A statement is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *United States Healthcare v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 923 (3d Cir.1990). The court must interpret the statement within its context to determine whether it has a defamatory meaning. *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399 (1987). The test is as follows:

The test is the effect the [utterance] is fairly calculated to produce, the impression it would naturally engender in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them.

*Id.*

■ In context, the term "con man" was capable of a defamatory meaning. The effect that this statement would have had on *La Repubblica*'s readership, and any subsequent audience in Pennsylvania, could be to defame defendant Glanton as a criminal. *See, e.g., Frederick and Filosa v. Reed Smith, Shaw & McClay,* No. Civ. A. 92–0592, 1994 WL 57213 at *10–*12 (E.D.Pa. Feb. 18, 1994); *Clemente,* 749 F.Supp. at 672, 677;

---

9. Plaintiffs and defendants dispute the status of Gianni Borgna in relation to defendant Glanton's libel and slander claims. Plaintiffs assert that Borgna is not a party to this action, and that Rule 14(a) does not allow a party to implead a nonparty solely to assert a counterclaim against him. *See, e.g., Toberman v. Copas,* 800 F.Supp. 1239, 1241–42 (M.D.Pa.1992); *see also United States Fire Ins. Co. v. Reading Municipal Airport Auth.,* 130 F.R.D. 38, 39 (E.D.Pa.1990). The court's view on the disputed procedural issue is explicated in footnote 8, *supra.*

10. A party may succeed in a claim for defamation absent proof of special harm where spoken words constitute slander per se. *Walker v. Grand Cent. Sanitation, Inc.,* 430 Pa.Super. 236, 634 A.2d 237, 241–244. Four categories that constitute slander per se are: words imputing criminal offense; loathsome disease; business misconduct; or serious sexual misconduct. *Tuman v. Genesis Assoc.,* 935 F.Supp. 1375, 1392 (E.D.Pa. 1996); *Clemente v. Espinosa,* 749 F.Supp. 672, 677 (E.D.Pa.1990).

*Agriss v. Roadway Exp., Inc.*, 334 Pa.Super. 295, 483 A.2d 456, 461–63 (1994)

As for the supposedly defamatory statements involving plaintiff Guizzetti, the article that defendant Glanton has cited involves Guizzetti's unfavorable personal opinions of Glanton's actions in Rome, i.e., his having "purposefully misled me, the Mayor of Rome, and other high-level city administrators, the ambassador of italy to the United States, and the Italian corporate sponsors who offered U.S. $3 million to host the exhibition," rather than matters that would harm Glanton's reputation. Def. Countercl. Ex. D. A statement that is a mere expression of opinion is not defamatory. *Walker*, 634 A.2d at 240. As a result, Guizzetti's statements are not actionable. Nor do the Roman officials in the article allege "criminal conduct" on the part of defendant Glanton in "obtaining the hospitality of the City of Rome under false pretenses." Def. Counterclaim Count V, ¶ 38. Rather, in the article in question they express their opinions about what they believed the status of the negotiations with the Barnes Foundation to be. *See id.* Ex. D; *Walker*, 634 A.2d at 240.

In addition, with regard to the incidents involving Borgna, Guizzetti, and plaintiff City of Rome, Glanton has not established actual malice. Actual malice has been defined as knowledge that the statements in question were false or were published with reckless disregard of their falsity. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The standard for "reckless disregard" is a subjective one, and it requires that the defendant either have in fact entertained serious doubt as to the truth of his published statement, or that the defendant actually had a high degree of awareness of the probable falsity of that statement. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989). Actual malice must be shown by clear and convincing evidence. *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1318 (3d Cir.1994).[11] Defendant Glanton has not established any evidence that plaintiff Guizzetti, or Borgna and other Roman officials, were aware that their sentiments were unfounded when they were made.

Defendant Glanton has also claimed that plaintiffs have deliberately caused widespread publication of libels within the public press. These allegations have centered primarily on quotations from pleadings and orders filed before this court and repeated in the press. *See id.* Ex. E. Statements made during the course of a judicial proceeding are absolutely privileged. *Pawlowski v. Smorto*, 403 Pa.Super. 71, 588 A.2d 36, 41 (1991). Media statements disseminated by attorneys are extrajudicial communications protected by a qualified immunity, even in their reiteration of the contents of privileged judicial documents. *Pelagatti v. Cohen*, 370 Pa.Super. 422, 536 A.2d 1337, 1344 (1987), *alloc. den.*, 519 Pa. 667, 548 A.2d 256 (1988). The media accounts filed with the court during this proceeding reported statements made in documents filed during the litigation. These included reports of discovery disputes about whether defendant Glanton used the negotiations with Rome and Munich as a subterfuge for advancing his private law practice.[12] The court ruled on

---

**11.** The Third Circuit applies the *New York Times* standard to media and non-media defendants, when applicable. *See U.S. Healthcare*, 898 F.2d at 931.

**12.** *See, e.g.*, Plaintiff's Motion for Sanctions and to Compel the Continued Deposition of Richard Glanton, Ex. A, in which defendant Glanton set forth the revenue structure at Reed, Smith, Shaw, & McClay:

Q: [H]ow is the calculation made as to the way in which your revenue is tied to business you generate?

A: It's not, except in a very general way . . . to the extent that revenue is one of the factors.

We're not what you call an eat what you kill firm, and we're not what you call a quote, attribution firm. We are an institutional firm and the clients where the firm have been there, basically Reed, Smith was a firm that represented the robber barons and has an established client base, over 100 years. And as a consequence, we don't have the topsy-turvy, up and down sort of casino activity compensation system that might prevail at other places. Ours is very steady, easy as you go, narrow band between the highest and lowest paid lawyers. The highest paid lawyer cannot make more than 3.5 times the lowest paid lawyer, so within that compensation band, I'm compensated. *Id.* at 305–06.

those discovery disputes. Among those rulings was an order that defendant Glanton give deposition testimony on that issue and orders cutting off a wild goose chase to depose newspaper reporters and Rome's lawyer in this case on that issue. *See* Court's Order of Feb. 12, 1997 (order quashing subpoena of Shannon Duffy); Court's Order of Feb. 12, 1997 (order quashing subpoenas of Joseph Daughen and Leonard W. Boasberg); Court's Order of February 10, 1997 (order granting plaintiffs' Motion for a Protective Order); Court's Order of February 5, 1997 (order granting in part and denying in part plaintiffs' Motion for Sanctions and to Compel the Continued Deposition of Richard Glanton). Such management of the case was necessary to keep the litigation within the bounds of reason; the court has given the defendants an adequate opportunity for discovery on this claim, and the claim has proven to be without merit. Summary judgment is entered on this count.

## 5. *RICO*

Plaintiffs also seek summary judgment on defendants' RICO claims. In Count VI, the defendants allege that plaintiff Guizzetti engaged in various acts of wire and mail fraud to induce defendant Glanton to go to Rome while misrepresenting the nature of the proposed negotiations with the Mayor of Rome. Counterclaim Count VI, ¶¶ 49–53. Defendants also allege that Guizzetti's misrepresentations to Glanton were part of a larger scheme of fraudulent transactions with other companies and art exhibitions. Counterclaim Count VI, ¶¶ 43–47.

The RICO statute creates a private cause of action for any person injured in his business or property by a violation of 18 U.S.C. § 1962. *See* 18 U.S.C. § 1964(c). Section 1962(c) prohibits a person employed by or associated with any enterprise engaged in or the activities of which affect interstate or foreign commerce, to conduct or participate in conduct of the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). To maintain a claim for a violation of § 1962(c), a litigant must set forth: 1) the existence of an enterprise that affects interstate commerce and is separate and distinct from the defendant; 2) that the defendant was associated with the enterprise; 3) that the defendant conducted or participated in the affairs of the enterprise; 4) that each defendant engaged in a pattern of racketeering activity; and 5) the racketeering was the proximate cause of injury to the plaintiff. *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1165 (1989). A § 1964(c) action based on § 1962(c) requires a claim against defendant "persons" acting through a distinct "enterprise," but allegations of conduct by officers or employees who operate or manage a corporate enterprise will satisfy this requirement. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 268 (3d Cir. 1995). Section 1962(d) prohibits any person from conspiring to violate §§ 1962(a)-(c). 18 U.S.C. § 1962(d). A claim under § 1962(d) requires a litigant to plead and prove 1) an agreement to commit the predicate acts; 2) knowledge of those acts as part of a pattern of racketeering in violation of (a), (b), or (c); and 3) an injury proximately caused by the conspiracy. *Shearin*, 885 F.2d at 1166.

To survive summary judgment on a § 1964(c) claim predicated on § 1962(c), a litigant must establish a pattern of racketeering activity, and this "pattern" must include at least two instances of statutorily specified activities within a ten year period, although two acts in and of themselves may not constitute a "pattern" for the purpose of RICO liability. 18 U.S.C. § 1961(5); *H.J. Inc., v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899–2900, 106 L.Ed.2d 195 (1989). A RICO litigant need not establish the existence of multiple criminal schemes. *Id.* at 240, 109 S.Ct. at 2901. Predicate acts that further a single scheme may suffice, provided that the scheme meets the other requirements of a pattern of racketeering activity: 1) the predicate acts are related; and 2) the predicate acts amount to or pose a threat of continued criminal activity. *Id.* at 239–40, 109 S.Ct. at 2900–01.

Predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901. For the pur-

pose of a RICO claim, continuity may be considered either a closed or open-ended concept, "referring either to a closed period of repeated conduct, or by past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902 (citing *Barticheck v. Fidelity Union Bank/First National State,* 832 F.2d 36, 39 (3d Cir.1987)). A litigant may demonstrate closed-ended continuity by proving a series of predicate acts over a "substantial" period of time. *Id.* at 242, 109 S.Ct. at 2902. Whether a period of time is "substantial" will turn on the facts of an individual case, but conduct that does not last for more than twelve months will not meet the standard in this circuit for closed-ended continuity. *Tabas v. Tabas,* 47 F.3d 1280, 1293 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995). As for open-ended continuity, predicate acts that occur over a few weeks or months will not satisfy the continuity requirement unless these acts demonstrate a threat of future criminal activity. *H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. at 2902–03.[13]

Mail fraud has two elements: 1) a scheme to defraud, and 2) use of the mails in furtherance of the scheme. 18 U.S.C. § 1341; *United States v. Dreer,* 457 F.2d 31 (3d Cir.1972). Wire fraud requires: 1) a scheme to defraud, and 2) use of interstate communications in furtherance of the scheme. 18 U.S.C. § 1343. Defendants have indeed alleged predicate acts of wire and mail fraud, but they have not produced sufficient evidence on this record to establish a question of material fact as to the elements of mail and wire fraud.

Moreover, despite an actively pursued course of discovery, defendants have not offered up evidence of record to establish the existence of a pattern of racketeering activity or the requisite causation for either § 1962(c) or (d). Defendants have alleged a closed-ended scheme in which Guizzetti engaged in a series of false deals. The record has only produced evidence of failed deals in which Guizzetti pursued courses of action in what might be described as a less than graceful manner. In *Tabas,* the Third Circuit recognized that its interpretation of the RICO requirements would encompass "garden variety fraud cases," *see Tabas,* 47 F.3d at 1296, and this court also recognizes that RICO must be "read broadly." *Id.* at 1297. RICO was not meant to sweep this broadly, nor was the statute intended to remedy all sharp dealing. Summary judgment is entered on this count as well.

### 6. *Contribution*

In Count VII, defendants assert a claim for contribution and state that any right to recovery that plaintiffs may have can be attributed to the false statements that plaintiffs and third party defendants made to one another "concerning defendants' position regarding the necessary elements of the contract." Counterclaim Count VII, ¶ 55. Plaintiffs argue that this claim is premature and can only arise after trial and judgment against the defendants. *See Stahl v. Ohio River Co.,* 424 F.2d 52, 55–56 (3d Cir.1970); 42 Pa. Cons.Stat. Ann. § 8324(a)-(b) (West 1982 & Supp.1996).

Putting aside the difficult jurisdictional issues that this count presents, defendants have not demonstrated how the third parties they have sought to join are or may be liable to defendants for all or any part of the claims against the defendants, even if Rule 14(a) permits acceleration as a procedural matter. *See, e.g.,* 3 James Wm. Moore et al., *Moore's Federal Practice,* §§ 14.05(2), 14.07 (3d ed.1997). Thus, while Rule 14(a) authorizes the assertion of future, contingent, unmatured claims against third parties, defendants have not demonstrated any substantive basis for such a claim. *See Stahl,* 424 F.2d at 56. Summary judgment is entered on this count.

---

**13.** A RICO litigant need not prove that the predicate acts pose some form of "societal threat" to satisfy the continuity requirement, as the focus of analysis of the continuity requirement is on the commission of predicate acts or the threat of similar acts in the future. *Tabas,* 47 F.3d at 1293 n. 17; *see also H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. at 2902–03.