RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0342p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNIVERSITY OF PITTSBURGH,

     *Plaintiff-Appellant,*

     *v.*

No. 07-6062

DAVID TOWNSEND; RONALD NUTT; CTI
MOLECULAR IMAGING, INC.; CTI PET SYSTEMS,
INC.,

     *Defendants-Appellees.*

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 04-00291—C. Clifford Shirley, Jr., Magistrate Judge.

Argued: June 9, 2008

Decided and Filed: September 9, 2008

Before: BOGGS, Chief Judge; RYAN and COLE, Circuit Judges.

---

## COUNSEL

**ARGUED:** David G. Oberdick, MEYER, UNKOVIC & SCOTT, Pittsburgh, Pennsylvania, for Appellant. Daniel F. Diffley, ALSTON & BIRD, Atlanta, Georgia, for Appellees. **ON BRIEF:** David G. Oberdick, Andrew L. Noble, Stacey M. Noble, MEYER, UNKOVIC & SCOTT, Pittsburgh, Pennsylvania, Andrew R. Tillman, PAINE, TARWATER, BICKERS & TILLMAN, Knoxville, Tennessee, for Appellant. Daniel F. Diffley, Samuel R. Rutherford, Randall L. Allen, ALSTON & BIRD, Atlanta, Georgia, J. Chadwick Hatmaker, WOOLF, McCLANE, BRIGHT, ALLEN & CARPENTER, Knoxville, Tennessee, for Appellees.

---

## OPINION

---

COLE, Circuit Judge. Plaintiff-Appellant University of Pittsburgh ("University") brought suit against Defendants-Appellees David W. Townsend, Ronald Nutt, CTI Molecular Imaging, Inc. ("CTI"), and CTI PET Systems, Inc. ("CPS") (collectively, "Defendants"), claiming that Defendants misappropriated the University's rights and interests in a type of medical-scanning technology that the University alleges was collaboratively invented at its campus over a period of several years. The University's complaint, as amended, asserts that Defendants, either individually or collectively, breached certain contracts, tortiously interfered with contractual relations, breached fiduciary duties, misappropriated or converted proprietary interests and rights, engaged in an unlawful conspiracy,

1

committed fraud and misrepresentations, and were unjustly enriched by their actions. Defendants moved for summary judgment on the ground that the University's claims were time-barred by the applicable statutes of limitations. In response, the University filed a motion for partial summary judgment. The district court granted summary judgment to Defendants and dismissed the complaint. On appeal, the University calls upon us to reverse the district court and hold that its claims were timely filed under the pertinent statutes of limitations. For the following reasons, we **AFFIRM**.

## I.

### A.          Factual Background

A working relationship between Defendants David Townsend and Ronald Nutt arose in the 1980s, when Nutt served as co-founder of CPS and Townsend was employed as a faculty member at the University of Geneva. Their collaboration revolved primarily around Positron Emission Tomograph ("PET") imaging, a process by which diagnostic images are created based on the detection of radioactive isotopes injected into a patient prior to a scan. In 1991, Townsend and Nutt formulated the idea of integrating a PET imaging scanner with a Computerized Axial Tomograph ("CT") scanner, which incorporates special x-ray equipment to obtain image data from different angles around a patient's body, and then uses computer processing to show a cross-section of body tissues and organs.

To formalize their collaboration, Townsend entered into a written consulting agreement with CPS on October 1, 1992. Effective from the date of signing until September 30, 1993, the agreement contained a provision assigning all of Townsend's intellectual property rights to CPS. This provision reads in pertinent part as follows:

> All inventions, all patents, and all materials for which copyright protection may be obtained which are made, developed, discovered, composed, or conceived by employees and consultants in the course and scope of their employment by CTI which relate in any way to CTI's actual or planned business, interests, or investigations are the sole property of CTI, unless specifically disclaimed by CTI in writing. Each employee and consultant is obligated to promptly bring these inventions, patents, and materials to management's attention. CTI continues to have ownership rights to these inventions and materials, even after an employee or consultant terminates employment with CTI.

(JA 178.) Following the expiration of the consulting agreement, Townsend signed a second year-long consulting agreement on May 1, 1994. This second agreement also contained the foregoing provision. At the same time that Townsend served as a consultant to CPS, the University recruited him to serve on its faculty as an Associate Professor of Radiology. Townsend joined the University faculty on September 1, 1993 and was tendered a formal engagement letter dated October 21, 1993. Included with this letter was a copy of the University's Faculty Handbook, and one of the sections in this publication set forth the "University Policy on Patents." The Policy provides, in pertinent part, as follows:

> II. Title to Patents
>
> A. The University claims ownership and control of the worldwide patent rights that result from activities of its faculty, staff, and students. University "faculty and staff" shall include all persons who hold any official faculty or staff relationship to the University, with the exception of those persons who render their services to the University on a gratuitous basis. This exception does not include faculty who are members of professional corporations affiliated with the University, even though the faculty may receive all or part of their compensation from the professional

corporation. The inventor will normally receive 30 percent and the University 70 percent of the net financial returns from the sale, licensing, or other transfer of such patent rights . . . .

. . .

D. Patent rights resulting from government-sponsored research grants, contracts, fellowships, or other such arrangement, are controlled by the terms of those agreements, but as between the University and faculty members and staff accepting such grants, Section A shall govern . . . .

University Procedure for Patents
II. B. An assignment of all worldwide rights, title and interest by the inventor(s) to the University in the development and improvements therein will be obtained prior to initiating any patentability evaluation, search, patent application, or other legal costs.

(JA 179-80.) While this provision expressly relates only to patents, the Handbook specifies that trade secrets or "know-how," although not patentable, are subject to the same policies as patentable inventions. Additionally, the Handbook concludes with the following disclaimer:

This [H]andbook is prepared for the information of the membership of the faculty of the University of Pittsburgh. The Handbook for Faculty is not intended to be a complete statement of all University faculty and academic policies. The policies and practices described are subject to change by the University. They are not to be considered or otherwise relied upon as terms and conditions of employment and the language used in this [H]andbook is not intended to create a contract between the University of Pittsburgh and its employees.

(JA 181.) Townsend remembers receiving the letter and the Handbook as an enclosure, but does not recollect actually reading through the contents of the Handbook.

At the time of Townsend's hiring, the University indicated that it was aware that Townsend was collaborating with CPS, but the University neither asked Townsend to provide a copy of the consulting agreement nor sought information from Townsend about the terms of the agreement. Townsend, however, claims that he disclosed his consultant status to the University upon completing the requisite conflict-of-interest forms. In a conflict-of-interest form dated in 2001, Townsend indicated that he served as a paid consultant with CPS, and on a 2002 form, Townsend responded affirmatively to the question, "Are you or a member of your immediate family the inventor of any technology for which an invention disclosure has been filed or which is being developed or evaluated in connection with your research activities?" (JA 181-82.) Upon further elaboration, Townsend wrote on the 2002 form that "[a]n application has been filed for a patent on the PET/CT scanner. The application was filed by CPS." (JA 182.)

After commencing his position at the University, Townsend asked CPS to forward any salary received under his consulting agreement directly to the University. Notwithstanding this payment arrangement, the University's financial officers did not recognize the monthly payments from CPS as stemming from the consulting agreement but instead designated the payments as gifts to the University.

Several years later, in 1995, Townsend applied for and was awarded a grant from the National Institutes of Health ("NIH") covering the period from July 1, 1995 to June 30,1999. Upon expiration of this grant, Townsend sought funding for a continuation grant from the NIH, which he successfully obtained on June 29, 1999. This second NIH grant covered the period from April 1, 2000 to March 31, 2003. Both grant applications identified Townsend as the principal investigator for the project,

entitled "A Combined PET and X-ray CT Tomograph for Clinical Use." The grant applications further identified Nutt as one of several consultants on the project. Included among the materials in support of the first grant application was a letter from Nutt to Townsend dated October 13, 1994 stating, "as you know, one of the most important parameters in my decision to enter into a joint agreement to develop a PET/CT tomograph with you and [the University] is that you have already demonstrated the ability to initiate, direct and complete an important joint PET tomograph development with CPS." (*Id.*) Despite the fact that Townsend was the recipient of the grant, pursuant to guidelines governing federal research grants, the money was directed to the University.

In September 1995, the University drew on a portion of the NIH grant funds to purchase a PET scanner from CPS. Although the University initially bought this device for use in the PET/CT prototype, Nutt recommended that the University use the device clinically, as part of its work with patients, until the prototype design was finalized. When CPS asked the University to return the scanner in December 1997 for use in the prototype, the University refused. CPS therefore used its own funds to purchase another PET scanner. That is, no grant funds were ultimately used in the purchase of the PET scanner that became part of the first prototype. The prototype was completed and fully functional in early February 1998, and was initially housed at CPS facilities in Knoxville, Tennessee. The device was later installed at the University in April 1998.

At this time, Townsend sought permission to work for part of the year at CPS in Knoxville and discussed this possibility with Dr. David Gur, Vice Chairman of the University's Department of Radiology and Townsend's supervisor. Although Gur was initially concerned that Townsend's work in Knoxville might create problems with respect to intellectual property rights arising from the collaboration, Gur ultimately allowed Townsend to work from CPS's Knoxville office in exchange for a promise by CPS to pay a portion of Townsend's salary to the University.

Prior to departing for Knoxville, on July 26, 1999, Townsend followed the protocol delineated in the University Policy on Patents and submitted to the University an "Invention Disclosure Statement" for an invention termed "A Combined PET and X-Ray CT Tomograph for Clinical Use." The statement identified Townsend and Nutt as the co-inventors and CPS as a potential licensee. The form included a formal assignment clause, in which faculty were requested to assign any invention to the University. Townsend, however, did not complete this section and was never asked to assign any interest in the PET/CT scanner to the University. Reed McManigle, an official with the University's Office of Technology Management, stated that he was not concerned when Townsend failed to execute the assignment clause because he believed that "the University's rights in the invention had been established by the agreement I negotiated with Townsend and Nutt on behalf of CPS and summarized in the June . . . 1999 letter to Dr. Gur." (*Id.*) Moreover, in McManigle's experience, "it is not uncommon for a written assignment from an inventor to be provided after the invention disclosure and closer to the licensing stages." (*Id.*)

On July 28, 1999, the University's Technology Transfer Committee approved the filing of a patent application on the PET/X-Ray CT Tomograph Townsend identified in the Invention Disclosure Statement. Two days later, on July 30, 1999, McManigle sent a letter to Gur to confirm that the Office of Technology Management was "quite comfortable with [Townsend's] evolving relationship with CPS, and has no objections to the commencement of . . . Townsend's in residence research relationship with CPS." (*Id.*) The letter further provided that Townsend would remain a University employee during the period of his research in Knoxville and that "any new inventions in which . . . Townsend is at least a co-inventor, will be owned in part by the University." (*Id.*)

After Townsend began his work in Knoxville, the University and CPS entered into a Research Agreement in August 1999, whereby CPS paid the University $350,000 to perform 200 patient scans as part of the clinical validation process of the PET/CT prototype. The agreement contained a contingency clause providing that it became effective only "upon intellectual property issues being

satisfactorily resolved by the University of Pittsburgh Office of Technology Transfer, Siemens, and CPS." (*Id.*) Despite the existence of this language, the University received payment for the patient scans it performed utilizing the prototype, although the parties never finalized the intellectual property issues surrounding the technology.

In October 1999, Pitts & Britain, a law firm serving as patent counsel to CPS, filed a provisional patent application for the combined PET/CT scanner with the Public Health Service Division of the Department of Health and Human Services. The application listed Townsend and Nutt as the inventors and included a form entitled "Statement Claiming Small Entity Status (37 CFR 1.9(f) & 1.27(b)) – Independent Inventor." (*Id.*) This form included the following paragraph:

> Each person, concern, or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey or license any rights in the invention is listed below:
>
> ___     No such person, concern, or organization exists
>
> _X_     Each such person, concern, or organization is listed below.
>
> CTI Pet Systems, Inc. 810 Innovation Drive, Knoxville, TN 37932.

(JA 194.) Pitt & Britain sent a copy of the provisional application to McManigle. Thereafter, Pitt & Britain filed three non-provisional patent applications, all of which listed Townsend and Nutt as inventors and CPS as assignee but were silent with respect to the University.

In November 1999, the University acted pursuant to the Bayh-Dole Act, 35 U.S.C. § 202(c)(2),[1] which relates to the receipt of federal funds for government-funded research, to elect title to the PET/CT scanner. Despite this election of title, CPS began to develop commercially the PET/CT scanner, and the first model was installed at the University's Medical Center in August 2001. Subsequently, CPS sold scanners on the commercial market at prices ranging from $1 million to $1.3 million.

In November 2001, the University requested that Townsend terminate his relationship with CPS and join its competitor, General Electric. When Townsend refused, he simultaneously stepped down as director of the University's PET facility and permanently resigned from the University faculty on January 31, 2003. Two months prior to his resignation from the University, Townsend signed a Royalty Agreement with CPS, in which he assigned his patent rights in the PET/CT scanner to CPS in exchange for a royalty rate of $1,500 per unit sold. At the close of 2005, Townsend had collected $742,500 in royalty payments pursuant to this agreement.

## B.     Procedural History

The University initially filed suit against Defendants in the United State District Court for the Western District of Pennsylvania. The case was transferred pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Eastern District of Tennessee, where the University filed an amended complaint on April 19, 2005. The parties consented to the jurisdiction of a magistrate judge.

---

[1] The Bayh-Dole Act, also known as the University and Small Business Patent Procedures Act, 38 U.S.C. §§ 200-212, provides universities, small businesses, and non-profit organizations with intellectual property control over their inventions arising from federal government-funded research. The Act is significant in the field of intellectual property because it reversed the presumption that title to the fruits of government-funded research went directly to the government.

In its amended complaint, the University asserted the following claims against Defendants: (1) Townsend breached his employment contract, including the rights and obligations under the University's Patent Policy; (2) CPS breached its obligations to the University as set forth in its Research Agreement of August 1999 and the parties' related oral agreements; (3) CPS tortiously interfered with the University's contractual relations with Townsend; (4) Nutt tortiously interfered with the University's contractual relations with Townsend and CPS; (5) Townsend and CPS breached their fiduciary duties to the University; (6) Defendants misappropriated and converted the University's proprietary interests and rights; (7) Defendants participated in a civil conspiracy; (8) Defendants engaged in fraud and misrepresentation; and (9) Defendants were unjustly enriched. The University sought a declaratory judgment, injunctive relief, and money damages. Defendants moved for summary judgment, and the University, in turn, filed a motion for partial summary judgment.

In a well-reasoned opinion, the district court granted the Defendants' motions for summary judgment and denied the University's motion for partial summary judgment. The district court first conducted a choice-of-law analysis and explained that when a case is transferred pursuant to 28 U.S.C. § 1404(a), the receiving court must apply the choice of law of the transferring court. Accordingly, given that the matter arose under diversity jurisdiction, the court determined that Pennsylvania law governs the contract, contract-related, and tort claims in the action. With respect to the applicable statutes of limitations, the court found that, pursuant to Pennsylvania law, the University's tort claims are subject to a two-year statute, while the University's contract claims are subject to a four-year statute.

Applying these statutes of limitations, the court first stated that ascertaining whether a statute of limitations has expired is generally a question of law to be resolved by the court rather than a fact-finder. Accordingly, the court addressed whether the various tolling doctrines raised by the University, including the discovery rule, the doctrine of fraudulent concealment, and the continuing-breach doctrine, acted to preserve the timeliness of the University's action. The district court determined that the discovery rule was inapplicable and that neither the doctrine of fraudulent concealment nor the continuing-breach doctrine were triggered because the University was unable to identify any affirmative, independent acts of concealment on the part of Defendants.

Accordingly, the court dismissed all of the counts in contract and tort set forth in the University's amended complaint. The University timely appealed.

## II.

### A.    Standard of Review

We review a district court's grant of a motion for summary judgment under a *de novo* standard. *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006). A moving party is entitled to a grant of its motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is initially upon the moving party to show that there does not remain in dispute any genuine issue of material fact. *General Motors Corp. v. Lanard Toys Inc.*, 468 F.3d 405, 412 (6th Cir. 2006). The moving party may satisfy this burden by pointing out to the district court that there is no evidence underlying the non-moving party's case. *Id.*

Once the moving party supports its motion for summary judgment, the opposing party must go beyond the contents of its pleadings to set forth specific facts indicating the existence of a genuine issue to be litigated. Fed. R. Civ. P. 56(e); *see also Natl. Solid Wastes Mgmt. Ass'n v. Voinovich*, 959 F.2d 590, 592 (6th Cir. 1992). When a court thereafter reviews this record, it is to draw all inferences

in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 577 (1986). Ultimately, the proper inquiry is whether the state of the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 252; *Stromback v. New Line Cinema*, 384 F.3d 283, 292 (6th Cir. 2004).

## B.      Statutes of Limitations

On appeal, the parties do not dispute that the two-year statute of limitations for tort actions and the four-year statute of limitations for contract actions provided for under Pennsylvania law apply to all of the counts enumerated in the amended complaint. Rather, the central question concerns the timeliness of the University's actions in tort and contract against Defendants. The University argues that the district court erred in holding, as a matter of law, that when Defendants filed the Small Entity form in November 1999, the University was put on notice that Defendants had not assigned their interests in the PET/CT Scanner to it and therefore could have maintained an action in contract and tort at that time. According to the University, the fact that Defendants did not list the University on the Small Entity form as an organization to which they had agreed to "assign[], grant[], convey[], or license[]" or were "under an obligation under contract or law to assign, grant, convey, or license any rights in the invention" did not necessarily put it on notice; rather, the University contends, "[t]he Small Entity form equally could have been disclosing nothing more than that CPS . . .  was 'an organization to which I am under contract or law to . . . **license** any rights in the invention." Given this alternative reading of the Small Entity form, the University claims that a fact-finder could reasonably conclude that Defendants only assigned their interests to CPS in 2002, when Defendants executed a Royalty Agreement expressly mentioning the assignment to CPS. And if 2002 were the date on which the statutes of limitations began to run, the University's maintenance of an action against Defendants on July 7, 2004 would be timely.

The law provides otherwise. Pursuant to the Pennsylvania Judicial Code, "limitations periods are computed from the time the cause of action accrued." 42 Pa.C.S. § 5502(c). Pennsylvania courts have found a cause of action to accrue "when the plaintiff could have first maintained the action to a successful conclusion." *Fine v. Checcio*, 582 Pa. 253, 266 (Pa. 2005) (citing *Kapil v. Ass'n of Pa. State Coll. and Univ. Facilities*, 470 A.2d 482, 485 (Pa. 1983)). In other words, the applicable clock starts running "as soon as the right to institute and maintain a suit arises." *Fine*, 582 Pa. at 266. This time frame reflects the "general rule" that a "party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." *Kingston Coal Co. v. Felton Min. Co., Inc.*, 690 A.2d 284, 288 (Pa Super. Ct. 1997). Moreover, "[m]istake, misunderstanding, or lack of knowledge in themselves" do not serve as defenses to the running of a statute. *Fine*, 582 Pa. at 266.

Pennsylvania law further sets forth a two-year statute of limitations for tort claims and a four-year statute of limitations for contract claims:

The following actions and proceedings must be commenced within two years:

1. An action for assault, battery, false imprisonment, false arrest, malicious prosecution or malicious abuse of process.

2. An action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another.

3. An action for taking, detaining or injuring personal property, including actions for specific recovery thereof.

4. An action for waste or trespass of real property.

5. An action upon a statute for a civil penalty or forfeiture.

6. An action against any officer of any government unit for the nonpayment of money or the nondelivery of property collected upon on execution or otherwise in his possession.

7. Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation, specified in this subchapter.

42 Pa. Const. Stat. § 5524.

The following actions and proceedings must be commenced within four years:

1. An action upon a contract, under seal or otherwise, for the sale, construction or furnishing of tangible personal property or fixtures.

2. Any action subject to 13 Pa. C.S. § 2725 (relating to statute of limitations in contract for sale).

3. An action upon an express contract not founded upon an instrument in writing.

4. An action upon a contract implied in law, except an action subject to another limitation specified in this subchapter.

5. An action upon a judgment or decree of any court of the United States or of any state.

6. An action upon any official bond of a public official, officer or employee.

7. An action upon a negotiable or nonnegotiable bond, note or other similar instrument in writing. Where such instrument is payable upon demand, the time within which an action on it must be commenced shall be computed from the later of either demand or any payment of principal of or interest on the instrument.

8. An action upon a contract, obligation or liability founded upon a writing not specified in (7), under seal or otherwise, except an action subject to another limitation specified in this subchapter.

42 Pa. Cons. Stat. § 5525.

Against this statutory backdrop, we now turn to the University's arguments on appeal. At the outset, we reject the University's argument that the district court incorrectly treated the issue of the statute of limitations as a matter of law, rather than fact. It is well-established under Pennsylvania law that "[w]hether the statute of limitations has run on a claim is generally a question of law for the trial judge." *Devine v. Hutt*, 863 A.2d 1160, 1167 (Pa. Super. Ct. 2004). Thus, the University's attempt to cast as error the district court's own disposition of the statute of limitations issue, without allowing it to proceed to a fact-finder, is unsubstantiated.

Additionally, we agree with the district court's conclusion that November 1999 marks the date on which the statutes of limitations began to run. As both the district court and Defendants point out,

several factual circumstances indicate that the University did not exercise reasonable diligence upon receiving information that Townsend may have intended not to assign his interests in the PET/CT scanner to the University. For example, it is undisputed that, at the time the University recruited Townsend to serve as a member of its faculty, the University was aware of a working relationship between Townsend and CPS but never took steps to inquire further about the nature of this relationship or how it might affect the intellectual property rights surrounding Townsend's inventions. Moreover, as soon as Townsend formally joined the faculty, the University began receiving payments from CPS pursuant to the consulting agreement between Townsend and CPS. The University, however, failed to investigate the basis of its receipt of these payments. Instead, the University simply characterized the money as "gift payments" without any further inquiry. While not necessarily indicative of Townsend assigning his rights in the PET/CT scanner to CPS, to the exclusion of the University, these facts, at the least, should have notified the University of Townsend's close relationship with CPS and mobilized the University to obtain further information about the nature of this relationship.

Furthermore, in July 1999, prior to resuming his research position in Knoxville, Townsend completed an Invention Disclosure form informing the University of his development of the PET/CT scanner. Despite filling out other sections of this form, Townsend did not complete or execute the required portion of the form making an assignment of his interests in the invention to the University. What is more, after receiving this document, no representative of the University contacted Townsend to effect an assignment. In failing to secure an assignment from Townsend, the University contravened its own policy on patents, which mandates that the University acquire an "assignment of all worldwide rights, title and interest by the inventor(s) to the University" prior to "initiating any patentability evaluation, search, patent application, or other legal costs." (JA 388.) The University's established policy on patents thus confirms that the University's failure to take action in response to the uncompleted assignment section falls short of reasonable diligence.

The University, however, insists that its causes of action did not accrue until 2002, when Defendants executed a Royalty Agreement expressly mentioning the assignment to CPS. This argument fails because it overlooks the significance of Defendants' earlier filing of a provisional patent application. In October 1999, the Pitts & Britain law firm filed a provisional patent designating Townsend and Nutt as inventors and listing CPS as the only organization to which rights in the invention were being "assigned, granted, conveyed, or licensed." (JA 1214.) Notably, the provisional patent application did not list the University as an organization to which Defendants intended to assign any rights in the invention. The University attempts to dismiss its omission from the provisional patent application as irrelevant and instead focuses on the supposed ambiguity of the listing of CPS. That is, the University claims that the listing of CPS could simply have signaled that Nutt and Townsend intended to license certain rights in the PET/CT scanner to CPS, without fully assigning rights to CPS. And mere licensing of rights to CPS would not contravene the contractual duties Defendants allegedly owed to the University.

Even if we were to accept that the listing of CPS raises ambiguity about licensing versus assignment, as the summary judgment standard arguably requires, such a concession does not alter the fact that the Statement Claiming Small Entity Status lacks any reference to the University. That is, we believe the pivotal fact is not the listing of CPS but the absence of any reference to the University on the form. It is this omission that should have put the University on notice, as early as 1999, that Defendants did not intend to assign their interests in the PET/CT scanner to the University. Taken together, these facts, even making all reasonable inferences in favor of the University as the non-moving party, establish that the district court properly concluded that the University's causes of action accrued in 1999 and therefore were barred by the applicable statutes of limitations.

## C.     Fraudulent Concealment

Having concluded that the University's causes of action accrued in 1999, we now turn to several exceptions to the statutes of limitations to determine if they operate to excuse the untimeliness of the University's suit. First, the University argues that the district court erred in granting summary judgment to Defendants because the court inappropriately determined that Defendants did not fraudulently conceal the running of the statutes of limitations. In advancing this argument, the University asserts that the district court too narrowly applied Pennsylvania law regarding fraudulent concealment by requiring an affirmative act or statement on the part of Defendants. While recognizing that mere silence is generally insufficient to support a claim of fraudulent concealment, the University nevertheless insists that silence suffices when there is a corresponding duty to speak. The University maintains that the district court erred in its application of the fraudulent-concealment doctrine, by failing to examine whether Defendants owed the University a duty of disclosure.

The doctrine of fraudulent concealment serves to estop a defendant from invoking the statute of limitations as a bar to suit when "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry." *Schaffer v. Larzelere*, 410 Pa. 402, 405 (Pa. 1963). Notwithstanding its name, the doctrine does not require "fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient." *Kingston Coal*, 690 A.2d at 290. Despite this relaxed definition of fraud, however, the plaintiff bears a heightened burden to prove "such fraud or concealment by evidence, which is clear, precise, and convincing." *Id*. To satisfy this burden, the invoking party must point to "some affirmative independent act of concealment" on the part of the defendant. *Id*. at 291. In the absence of an affirmative act, mere silence suffices as fraudulent concealment only when there is a requisite duty to disclose. *Weik v. Estate of Brown*, 794 A.2d 907, 911 (Pa. Super. Ct. 2002).

Our review of the record establishes that Defendants did not engage in any affirmative act of concealment to trigger the exception for fraudulent concealment. Defendants furnished the University with copies of both the July 1999 Invention Disclosure Form and the October 1999 provisional patent application. In both of these documents, Defendants clearly and expressly designated CPS as an assignee of the technology and were silent as to the University's rights in the invention. We strain to see how this explicit and direct communication between Defendants and the University satisfies the definition of concealment in any sense.

Alternatively, the University maintains that silence should suffice to invoke the doctrine of fraudulent concealment because Defendants owed the University a duty to disclose. Pennsylvania case law, however, does not provide support for the University's argument. Under Pennsylvania law, "[a] duty to speak arises when one party is in a fiduciary or confidential relationship to the other." *City of Rome v. Glanton*, 958 F.Supp. 1026, 1038 (E.D. Pa. 1997). Common examples of such relationships include those between attorneys and clients and between guardians and wards. *Glanton*, 958 F.Supp. at 1038. These relationships raise particular concern because "the relative position of the parties results in a situation in which one party has power and means to take advantage of or exercise undue influence over the other." *Id*.

No such disparity in power exists in the relationship between the University and Defendants. Rather, when "both plaintiff and defendant are sophisticated business entities, entrusted with equal knowledge of the facts and equal access to legal representation," "a duty to speak does not arise." *Id*. at 1039. The University is a large public research institution with significant resources and thus without doubt qualifies as a "sophisticated business entity." *See id*. Likewise, CPS is an incorporated research facility specializing in the complex field of PET scanning and so arguably is a "sophisticated business entity." *See id*. Between these two parties then, there is no duty to speak, and mere silence cannot thus give rise to fraudulent concealment. *See id*.

With respect to the University's relationship to Townsend and Nutt, Townsend was an employee of the University, while Nutt served in a consulting position to the University's CET/PT scanner development project. Given their status as individuals, and as subordinate individuals at that, it is the University that is in the position to "take advantage or exercise undue influence" over Townsend and Nutt. *Id.* at 1038. Assuming any duty to disclose exists, it flows from the University to Townsend and Nutt, not in the opposite direction. Thus, mere silence on the part of Townsend and Nutt is also insufficient to demonstrate fraudulent concealment. Accordingly, we are of the view that Defendants did not fraudulently conceal their activities from the University.

**D.    The Discovery Rule**

As a second exception to the running of the statute of limitations, the University tenders an argument under the discovery rule. The University's argument is unpersuasive. The discovery rule applies upon "a plaintiff's complete inability, due to facts and circumstances not within his control, to discover an injury despite the exercise of due diligence." *Kingston Coal*, 690 A.2d at 288. As with fraudulent concealment, the party invoking the discovery rule bears the burden of establishing its applicability. *Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995).

As a threshold matter, the University's argument that the district court incorrectly resolved the applicability of the discovery rule without submitting it to a jury is unconvincing. While Pennsylvania courts reserve questions about the discovery rule for the jury when "the issue involves a factual determination regarding what constitutes a reasonable time for the plaintiff to discover his injury and its cause," it is a "well established principle that where the facts are so clear that reasonable minds cannot differ, the commencement period may be determined as a matter of law." *Cochran*, 666 A.2d at 248. In the instant case, this principle governs, because even the exercise of the slightest diligence on the University's part – by reading the provisional patent application or the invention disclosure statement – would have put the University on notice of its claims. Thus, the district court did not err in conducting its own analysis of the applicability of the discovery rule as a matter of law.

Moreover, the discovery rule doctrine itself does not apply here because the University did not satisfy a precondition triggering its application, namely "the exercise of due diligence." *Kingston Coal*, 690 A.2d at 288. As we have explained, several factual considerations militate against a finding that the University exercised reasonable diligence in investigating its alleged injuries. Therefore, we affirm the district court's conclusion regarding the inapplicability of the discovery rule doctrine.

**E.    Continuing Breach**

As its final argument, the University claims that the district court did not properly apply Pennsylvania law regarding the breach of a continuing contract. We reject the University's claim. The continuing-breach doctrine represents the notion that "the statute of limitations does not run against a contractual cause of action which is a continuing one . . . the statute of limitations begins to run only from the time when the breach occurs or the contract is in some way terminated." *Thorpe v. Schoenbrun*, 195 A.2d 870, 872 (Pa. Super. Ct. 1963). "The test of continuity . . . is to be determined by the answer to the question whether the services were performed under one continuous contract, whether express or implied, with no definite time fixed for payment, or were rendered under several separate contracts." *Id.*

In the instant case, the University's contracts with both Townsend and CPS do not fall within the bounds of this definition, because they both are characterized by a "definite time fixed for payment." *Id.* First, the Research Agreement the University entered into with CPS in August 1999, whereby CPS paid the University $350,000 to perform 200 patient scans as part of the clinical

validation process of the PET/CT prototype, involved a predetermined payment schedule. Specifically, CPS agreed to pay the University in four installments of $87,500 spanning from August 15, 1999 to May 15, 2000. This payment schedule clearly qualified as a "definite time fixed for payment" and thus places the Research Agreement outside the bounds of the continuing-breach doctrine.

Likewise, with respect to the University's claims against Townsend, it is critical to note that the Faculty Handbook contains an express disclaimer that it does not constitute a contract. Therefore, the Handbook cannot support the University's claims under the continuing-breach doctrine. Furthermore, as a University employee, Townsend received his salary in regular payments. Thus, just as the payment schedule contained in the Research Agreement placed it outside the bounds of a continuing contract, the regular payments Townsend received as a faculty member place his employment contract outside the bounds of a continuing contract. Given the lack of any contract that can be characterized as continuing, Defendants' actions cannot amount to a continuing breach.

Moreover, we are unpersuaded by the University's extensive reliance on *Fenn v. Yale University*, 283 F.Supp. 2d 615 (D. Conn. 2003), in support of its continuing-breach argument. In that case, a professor at Yale University notified his superiors that his invention did not harbor much commercial potential, and, on the basis of this representation, Yale did not pursue a patent. The professor then independently submitted a patent application in his own name and licensed the technology to a private entity. *Fenn*, 283 F.Supp. at 625-57. Once Yale gained knowledge of the patent, it requested that the professor assign his patent rights, but the professor refused. *Id.* at 627-28. When Yale brought suit, the district court rejected the professor's attempt to raise the statute of limitations as a bar, because the professor's fraudulent concealment effectively tolled the limitations period. *Id.* at 637.

We agree with the district court in concluding that *Fenn* is readily distinguishable. While the professor in *Fenn* engaged in an affirmative instance of misrepresentation, Townsend's actions entail no misrepresentation. Rather, he disclosed the contents of his patent application to the University and thereby provided the University with notice of the commercial viability of the PET/CT scanner. Accordingly, *Fenn* does nothing to alter our determination that the University's invocation of the continuing-breach doctrine is unavailing.

### III.

For the preceding reasons, we **AFFIRM** the district court's grant of summary judgment to Defendants.