<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 18a0090n.06

No. 15-4182

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Feb 23, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ALLIED ERECTING AND DISMANTLING CO., INC., | ) ) ) | |
| Plaintiff-Appellant, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| UNITED STATES STEEL CORPORATION, | ) ) | OPINION |
| Defendant-Appellee. | ) ) | |

Before: MERRITT, MOORE, and BUSH, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** For decades, Plaintiff Allied Erecting and Dismantling Co., Inc. ("Allied"), has served Defendant United States Steel Corporation ("U.S. Steel") by dismantling U.S. Steel's defunct steelmaking facilities and salvaging the resulting scrap metal. And for decades, Allied and U.S. Steel have litigated claims arising from their dismantling-work agreements. In this action, Allied brought eight claims against U.S. Steel for breach of contract and one for a declaratory judgment, and U.S. Steel brought three counterclaims against Allied (the first and third for breach of contract, and the second for return of a $10 million advance payment). On appeal, Allied argues that the district court erred in (1) granting judgment as a matter of law for U.S. Steel as to three of Allied's claims (Counts III, IV, and V) on statute-of-limitations grounds; (2) granting summary judgment for U.S. Steel as to U.S. Steel's second counterclaim (that is, as to the $10 million advance payment); and (3) granting U.S. Steel's Rule

59(e) motion to alter or amend the judgment, which reduced Allied's damages on Count II to zero. For the reasons that follow, we reverse as to Allied's Counts IV and V, and we affirm in all other respects.

## I

Allied and U.S. Steel began working together in the 1980s, but this appeal traces its origins to 1992, when U.S. Steel hired Allied to dismantle its massive Fairless Works steelmaking facility in Fairless Hills, Pennsylvania. The parties entered into two contracts at that time: the 1992 Construction Contract and the 1992 Final Conformed Specification ("1992 Specification"). As the Fairless facility began to undergo dismantling, so did the parties' relationship: Allied sued U.S. Steel for additional compensation and other relief first in 1993 and then in 2002, resulting in settlement agreements not reached until 2003 and 2004, termed the 2003 and 2004 Agreements in Principle ("2003 AIP" and "2004 AIP"), respectively.

The 2003 AIP granted Allied the exclusive right to further dismantling work at Fairless, among other things; for its part, Allied agreed to perform certain dismantling work at Fairless at no cost to U.S. Steel other than that Allied would acquire title to scrap recovered during the dismantling (which Allied could then sell, subject to U.S. Steel's right of first refusal, to generate a profit). The 2004 AIP provided Allied with certain rights to dismantling work at sites other than Fairless. Among other things, the 2004 AIP also contemplated manufacturing (and not only dismantling) work, and it provided that U.S. Steel pay Allied a $10 million "non-refundable advance payment" that U.S. Steel would recoup in the form of discounts applied to invoices for the manufacturing work to be performed at Allied's yet-to-be-built manufacturing facility.

The parties entered into several subsequent contracts, bringing the total number of contracts governing the parties' relationship to ten, none of which entirely supersedes any other.

The trial record and the district court's orders and opinions sufficiently set forth the terms of these contracts, which we have reviewed but which we will not detail at any greater length in this opinion. Instead, we turn to Allied's three questions presented and address each issue in turn.

## II

### Judgment as a Matter of Law as to Allied's Counts III, IV, and V

Allied's Counts I through VI all arise from Allied's dismantling work at Fairless. The parties agree that Allied engaged in substantial dismantling work, tearing down out-of-use buildings and completing other related work at U.S. Steel's request. In its second amended complaint filed in June 2012, Allied asserted Counts III, IV, and V as follows:

**Count III.** Allied sought breach-of-contract damages under Section 3.1 of the 1992 Construction Contract arising from U.S. Steel's alleged delays in "releasing" facilities at Fairless to Allied so that Allied could begin dismantling them and salvaging scrap to sell. Allied alleged numerous sources of delays including, for example, U.S. Steel's "[f]ailing to complete necessary predecessor work, including the relocation of necessary utilities and/or the performance of asbestos removal, hazmat removal and/or environmental work." 2d Amended. Compl. 18–23.

**Count IV.** Allied sought breach-of-contract damages under Section 10.3 of the 1992 Specification for U.S. Steel's allegedly wrongful retention of (or indefinite indecision as to whether to retain) certain Fairless facilities for itself, without compensation, rather than either turning them over for Allied to dismantle or paying Allied the scrap value of such facilities. *Id.* at 23–25.

**Count V.** Allied sought breach-of-contract damages under Sections 5.2.2 and 5.2.3 of the 1992 Specification and Section III(c) of the 2003 AIP, alleging that U.S. Steel had prevented Allied from removing certain scrap and railroad track from areas being dismantled but had wrongly insisted that Allied dispose of creosote-containing railroad ties, when such railroad ties

3

were hazardous materials for which U.S. Steel was required to bear the cost of disposal. *Id.* at 25–27.

On motion by U.S. Steel, the district court granted judgment as a matter of law in favor of U.S. Steel as to all three of these counts.[1] The court held that Allied's claims in all three counts accrued in January 2007 at the latest and thus were time-barred under Pennsylvania's four-year statute of limitations for contract actions.

## A

We review de novo the district court's grant of judgment as a matter of law, using the same standard that the district court should have used, i.e., that such a grant is appropriate only when "no reasonable juror could have found for the nonmoving party." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 581 (6th Cir. 2001); *see* Fed. R. Civ. P. 50(a).

The parties generally do not dispute that Pennsylvania substantive law governs all the claims in this diversity-jurisdiction action, except that Allied contends that the issue of when its claims accrued is governed by federal, rather than state, law. But the case Allied cites for its proposition, *Ruff v. Runyon*, 258 F.3d 498 (6th Cir. 2001), involved claims under federal law, not state-law causes of action as here. When claims arise under state law, accrual of such claims is governed by state law as well. *See, e.g.*, *Univ. of Pittsburgh v. Townsend*, 542 F.3d 513, 523–24 (6th Cir. 2008) (applying Pennsylvania law to determine accrual date for claim arising under that state's law). We therefore apply Pennsylvania law in accordance with the controlling decisions of the Pennsylvania Supreme Court. *See Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). If that court has not yet addressed an issue presented, we predict how that court would rule in light of the decisions of Pennsylvania's intermediate

---

[1] The court carved out the "Fox Rail" portion of Count V from its order. This portion of Count V is not part of the present appeal.

appellate courts and other "relevant data." *Ibid.* (quoting *Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995)).

**B**

Allied advances two alternative arguments. First, Allied argues that its claims accrued in July 2009 (such that its June 2012 complaint was timely filed within the four-year statute-of-limitations period) rather than in January 2007 or earlier. Second, Allied argues that the district court erred in lumping together Counts III, IV, and V; the claims in Counts IV and V, Allied contends, were distinct and accrued at different times from Count III. Allied has failed to demonstrate that Count III was timely asserted, so we reject Allied's first argument. But because Allied has pointed to evidence of record that a reasonable jury could use to conclude that U.S. Steel wrongfully retained facilities and other materials from the scope of Allied's work during the four years preceding Allied's filing of its complaint, we agree with Allied's second argument and therefore reverse as to Counts IV and V only.

**C**

**Count III**

Under Pennsylvania law, an action upon a contract "must be commenced within four years." 42 Pa. C.S.A. § 5525. The four-year clock begins at "the time the cause of action accrued," 42 Pa. C.S.A. § 5502(a), that is, when "the plaintiff could have first maintained the action to a successful conclusion." *Kapil v. Assoc. of Pa. State Coll. & Univ. Faculties*, 470 A.2d 482, 485 (Pa. 1983); *see also Townsend*, 542 F.3d at 523 ("[T]he applicable clock starts running 'as soon as the right to institute and maintain a suit arises.'" (quoting *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005))). A party need only know that it has been damaged, not "the precise amount or extent of the damage." *Schnelling v. Prudential Secs., Inc.*, No. A03-6021, 2004 WL 1790175, at *2 (E.D. Pa. Aug. 9, 2004). And, under Pennsylvania law, determining the date of accrual is

properly the job of the court "where the facts are so clear that reasonable minds cannot differ." *Melley v. Pioneer Bank*, 834 A.2d 1191, 1201 (Pa. Super. Ct. 2003) (citation omitted).

Under Section III of the 2003 AIP and Section 3 of the 1992 Specification, Allied was supposed to complete dismantling on each phase of the Fairless project within three years after U.S. Steel granted authorization to begin work. The relevant phase for Count III is the dismantling of the Sheet & Tin Facility at Fairless. Allied's claim for damages arises under Section 3.1 of the 1992 Construction Contract, which provides:

> Should Contractor be delayed in the performance or completion of the work hereunder by Owner or by any cause beyond the control of Contractor, Owner will, at Contractor's request, extend by written order to be signed by its Purchasing Agent the work scheduled for a period of time equivalent to any such delay. Owner will pay Contractor any additional costs and loss of revenue incurred by Contractor as a result of any such delay if such delay is caused by Owner.

Allied (the "Contractor" in the above provision) argues that U.S. Steel (the "Owner") caused "such delay" when it delayed the start of Allied's work, failed to complete necessary predecessor work, and failed to remove live utilities, among other things. These delays produced damages, according to Allied, by increasing Allied's cost of work and decreasing Allied's efficiency.

U.S. Steel argued, and the district court ruled, that based on the trial testimony of Allied's own principal John Ramun, U.S. Steel authorized the commencement of work on the Sheet & Tin Facility in November 2003, and such work began in January 2004, meaning that the three-year period in which Allied was to dismantle the facility (if there had been no delays) would have ended in January 2007 at the latest. Allied responds that the date that matters for beginning the three-year dismantling-performance clock was not when U.S. Steel internally authorized Allied to commence the work but rather was in July 2006 when U.S. Steel issued an email that

Allied claims was a "notice to proceed." Thus, according to Allied, Allied's performance was not due until July 2009, and it was not until July 2009 that Allied could have known whether U.S. Steel's actions had delayed Allied's completion of the dismantling; Allied would therefore have had four years from July 2009 to assert its claim, making its claim timely.

We reject Allied's argument for a few reasons. First, the three-year time period in which Allied was to complete dismantling work has no legal bearing on the accrual of Allied's claim. Allied apparently hangs its hat on the contention that its delay damages, if any, accrued only when Allied itself was "late" in completing its dismantling work. But a deadline for Allied's performance is a provision for the benefit of U.S. Steel (and one that, as became clear at oral argument, U.S. Steel had no intention of enforcing anyhow), not a provision that aids in identifying the accrual date of a claim for harm to *Allied*. Moreover, harm to Allied from U.S. Steel's dilatory behavior would have caused Allied damages—and thus would have been actionable—as soon as U.S. Steel delayed or disrupted Allied's dismantling work, rather than only at the end of Allied's three-year time period for completing the work.

Citing Pennsylvania public-contract cases and authority from other jurisdictions, Allied contends that its claim accrued at the earliest when its work under the contract was due to be completed. At least in private-contract disputes, however, Pennsylvania courts do not appear to take such an expansive view of accrual. Unless the contract at issue is "continuous" (that is, it is "an agreement which does not fix any certain time for payment or for the termination of the services," *Thorpe v. Schoenbrun*, 195 A.2d 870, 872 (Pa. Super. Ct. 1963) (citation omitted)), a private-contract claim in Pennsylvania generally "accrues when the contract is breached," *Sadtler v. Jackson-Cross Co.*, 587 A.2d 727, 731 (Pa. Super. Ct. 1991). *See PSC Info Grp. v. Lason, Inc.*, 681 F. Supp. 2d 577, 588–89 (E.D. Pa. 2010). Allied's contract with U.S. Steel at

7

issue here was not continuous; therefore, each claim for delay damages arose when U.S. Steel's alleged act of delay occurred (at the time of breach) and not when Allied's performance under the contract was to be completed.

The second reason we reject Allied's position is that, even if we were to accept Allied's argument that the four-year statute-of-limitations period began only after Allied's three-year performance period ended, Allied's claim still would be time-barred because a reasonable jury could not conclude that Allied's performance began later than January 2004. Ramun's trial testimony is dispositive here:

> Q.  And if I understood your testimony this morning, it was that Allied began work in January of 2004 at sheet and tin; is that right?
> A.  Yes.
> Q.  And I believe you even said in every part of sheet and tin, correct?
> A.  Yes.
> Q.  Can we pull up –
> A.  I did dismantling work, yes, Allied did dismantling work.

Trial Tr. at 527:10–19; *see also* Trial Tr. 834:3–9. Allied has pointed to no responsive evidence of record to dispute Ramun's testimony of starting its dismantling work in January 2004, two and a half years prior to its receipt of the July 2006 email that it claims was a "notice to proceed."

Third, Allied's second amended complaint itself does *not* point to any specific, actionable instance of dilatory behavior by U.S. Steel that happened in June 2008 or later (i.e., within four years of the complaint).[2] Instead, the pleading sets forth facts alleging delay between January 2005 and October 2007. 2d Amended Compl. 7–8. This dearth of any pertinent allegation of post-June 2008 delay is consistent with Allied's failure to bring to this court's attention any evidence of such delay either.

---

[2] To the extent that U.S. Steel's uncompensated retention of facilities or materials (i.e., the subject of Counts IV and V) occurred within four years before Allied's filing its June 2012 complaint and was *also* dilatory, Allied may, on remand, pursue relief for those claims on the basis of U.S. Steel's allegedly wrongful retention of the facilities or materials.

In sum, Allied has failed to meet its burden in seeking reversal of the district court's grant of judgment as a matter of law as to Count III. We therefore affirm that grant of judgment for U.S. Steel.

**D**

**Counts IV and V**

Counts IV and V are meaningfully different from Count III because Allied has pointed to specific buildings and materials that U.S. Steel allegedly wrongly withheld from Allied's scope of work at Fairless. *See, e.g.*, 2d Amended Compl. 25 (identifying "the No. 1 Tin Warehouse, Raw Coil Structures, No. 1 Warehouse and No. 2 Warehouse"). And at trial, Allied introduced evidence that could lead a reasonable factfinder to conclude that U.S. Steel removed such buildings within the four-year period preceding Allied's filing of its June 2012 complaint. *See, e.g.*, P-218 at 1–2 (meeting minutes dated August 19, 2009, reflect U.S. Steel's decision to "put on hold" the demolition of various buildings at the Sheet & Tin Facility); P-199 (meeting minutes dated February 3, 2009); Trial Tr. 978–80 (testimony that in February 2009, buildings T2 and T4 at the Sheet & Tin Facility were "taken back" by U.S. Steel).

Allied's argument unfolds in a few steps: (1) as part of the parties' deal, Allied was to acquire ownership of all "scrap and equipment associated with various dismantling work to be performed at the Fairless Works Sheet and Tin [F]acility," in exchange for one dollar; (2) in August 2004, U.S. Steel issued Purchase Order PT 85012, the terms of which were extended through at least March 2010, granting Allied such ownership in exchange for one dollar; (3) Allied thus "owned" the scrap from buildings within the scope of its dismantling work, and, because Allied had commenced work at the Sheet & Tin Facility, Allied owned the scrap from buildings within the scope of its work at that facility; (4) U.S. Steel's "rights to remove any *complete facility* from the scope of [the 1992] Specification shall terminate upon the

commencement of work at that facility by AED," 1992 Specification at 67, para. 10.2 (emphasis added), meaning that U.S. Steel could not remove the Sheet & Tin Facility from the scope of Allied's work after Allied had begun work there; (5) U.S. Steel may have had the right to remove specific *buildings* from Allied's scope of work, *see id.* para. 10.3, but only if U.S. Steel paid "as compensation to [Allied] 50% of the 'Scrap Value,' i.e., No. 1 Heavy Melt price per gross ton for the amount of gross tons removed"; and (6) U.S. Steel, notwithstanding these provisions, had either removed buildings from the scope of Allied's work at the Sheet & Tin Facility without compensation or indefinitely placed on hold its decision as to whether to remove such buildings. Thus, Allied's argument goes, Allied was harmed to the extent that it could not either dismantle the withheld buildings for salvage or receive compensation for those buildings from U.S. Steel.

In granting U.S. Steel's motion for judgment as a matter of law, the district court treated Counts IV and V as though they necessarily accrued at the same time as Count III, without providing any additional reasoning as to why that would be so. A reasonable jury could have determined, however, that U.S. Steel's removal of specific buildings and materials from Allied's scope of work wrought harm that was independent of the more amorphous delay damages sought in Count III. And a reasonable jury could have determined that U.S. Steel took such actions after June 2008. We therefore reverse the district court's grant of judgment as a matter of law as to Counts IV and V and remand for further proceedings.

On remand, the district court is free to consider or reconsider other arguments presented by U.S. Steel that may warrant the reissuance of judgment in favor of U.S. Steel as to these counts. Specifically, U.S. Steel argued in support of its motion for judgment as a matter of law below that, in addition to its statute-of-limitations argument, "Allied has failed to present any evidence that it generated scrap from any of the buildings, basements, track and non-ferrous

materials that it claims to own (relating to Counts IV and V)," and U.S. Steel "object[ed] to Allied's expert's use of the Measured Mile methodology for computation of damages." R.296 at 4–5. The district court's order granting judgment as a matter of law rested its holding solely on statute-of-limitations grounds, but the district court did note that "all of [U.S. Steel's other] arguments have merit." We decline to treat this statement as an expression of alternative holdings, and, because these other arguments were not developed in the district court's order, we decline to address them on appeal. But the parties may litigate these other arguments on remand.

## III

### Summary Judgment for U.S. Steel as to Its Second Counterclaim

U.S. Steel's second counterclaim against Allied arose from the 2004 AIP, pursuant to which U.S. Steel paid Allied $10 million in July 2005 as a "non-refundable advance payment" that U.S. Steel would recoup through discounts on Allied's invoices for manufacturing work during a ten-year period (subsequently extended another year, to end March 31, 2015). Allied began construction on a manufacturing facility in Youngstown, Ohio, but never completed it; as a result, when U.S. Steel requested assurances that Allied would complete its facility and thus perform manufacturing work for U.S. Steel, Allied was unable to provide such assurances.

Under Pennsylvania law, a contract is repudiated when (1) a party has reasonable grounds for insecurity with respect to the other party's performance, (2) the party demands adequate assurance of the other party's performance, and (3) the other party fails to provide such adequate assurance. *See* 13 Pa. C.S. § 2609; Rest. 2d (Contracts) § 251.

U.S. Steel thus argued to the district court that Allied's failure to provide adequate assurances amounted to a repudiation of its obligation to perform manufacturing work and that U.S. Steel was thus entitled to a return of its $10 million advance, notwithstanding the fact that the 2004 AIP labeled the advance "non-refundable."

11

Allied disagreed, casting fault upon U.S. Steel's delays and disruptions for Allied's failure to complete the manufacturing facility. The gist of Allied's argument in this regard is that but for U.S. Steel's misdeeds, Allied would have had the funds and the ability to complete the manufacturing facility. Allied also argued that the advance was flatly non-refundable even if Allied refused to perform any manufacturing work at all.

The district court sided with U.S. Steel, relying on an instructive decision of the Pennsylvania Supreme Court. *See Wm. F. Mosser Co. v. Cherry River Boom & Lumber Co.*, 138 A. 85, 88 (Pa. 1927). In *Mosser*, the plaintiff paid a $150,000 advance to the defendant, which the plaintiff would recoup at the rate of one dollar per ton of tree bark delivered by the defendant for use in the plaintiff's tanneries. *See id.* at 86 (Under the contract, "[the] payment [was] to be returned [to the plaintiff] . . . by allowing a credit of one dollar ($1.00) per ton on all bark shipped . . . until the aggregate amount of credits so made shall amount to the advance payment . . . or until [150,000] tons of bark shall have been delivered[.]"). The defendant failed to perform, claiming impossibility because his trees underproduced; the defendant also claimed that he could keep the payment in full because he had turned over all the bark he could secure from his land and had, he argued, thereby discharged any further obligation. The court disagreed, focusing on the nature of an advance payment as a prepayment that creates "an implied promise to repay . . . any balance received in excess of the value of the goods forwarded." *Id.* at 87.

Thus, under the logic of *Mosser*, notwithstanding the "non-refundable" label of the $10 million advance payment, the district court held that Allied's total nonperformance justified return of the payment to U.S. Steel and granted summary judgment for U.S. Steel accordingly.

**A**

We review de novo the district court's grant of summary judgment. *See King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017). If Allied "is able to demonstrate that there is a genuine issue of material fact in dispute, then [U.S. Steel is] not entitled to summary judgment" as to its second counterclaim. *Ibid.*

**B**

Admittedly, the contract in this case differs from *Mosser* to the extent that the "advance" here, unlike that in *Mosser*, is expressly labeled "non-refundable." But, as the district court held, "the word non-refundable cannot be construed as a license to provide little or no consideration and to still retain an advance payment." R.174 at 37 (quoting *Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 516 (S.D.N.Y. 2012) ("[T]he non-refundable fee was paid by Soroof not as a gift but as one element in a bargained for exchange[.]")). Notably, though Allied takes issue with the district court's reliance on *Mosser* and *Soroof*, Allied cites no contrary authority whatsoever in its brief. Appellant's Br. 50–65.

A simple illustration shows why the district court's position is not only legally correct but also sensible. Consider a buyer who enters into a contract to purchase a home and, at the time of contract, tenders a "non-refundable" advance payment of a thousand dollars to the seller, who then takes the property off the market in anticipation of its sale. Of course, if the buyer subsequently decides not to purchase the property through no fault of the seller, the seller may rightly keep the advance payment—it's non-refundable, after all. But what if the seller breached the contract by selling the house to another, or by deciding against selling it altogether? Surely the seller could not both fail wholly to perform *and yet* keep the buyer's payment, even though the payment was styled "non-refundable." To the contrary, the buyer would be entitled to recover

the payment on account of the non-occurrence of the constructive condition of the seller's performance.

So, too, here: U.S. Steel is the buyer, and Allied is the seller. It is undisputed that Allied failed to construct its manufacturing facility and thus could not possibly perform manufacturing work for U.S. Steel within the eleven-year term of the parties' agreement. The parties' choice of words in their contracts may be questionable, and the notion that the advance payment was recoverable despite being non-refundable may be striking, but none of this gives rise to a question of fact. That is because Allied cannot point to evidence (whether in the contract itself or elsewhere) that the parties intended for Allied to keep the advance payment even if *Allied itself* totally breached. The district court thus rightly allowed U.S. Steel to recover its advance payment.

Some of the discussion in the briefs and especially before the district court concerns portions of the AIPs and subsequent agreements that are beyond the scope of the question before us. For instance, apart from the $10 million advance payment, U.S. Steel was obligated (under the 2004 AIP) to provide Allied with sufficient work outside of Fairless to generate $63 million in profit margin to Allied. This work could include manufacturing work—meaning that the $10 million advance payment could have counted toward the $63 million obligation if it needed to. But it is undisputed that it did *not* need to, because U.S. Steel provided well in excess of the amount of non-Fairless work necessary to meet its $63 million obligation *without* counting the $10 million advance towards the total.

Because U.S. Steel did indeed provide Allied sufficient remediation work to satisfy the $63 million profit-margin obligation exclusive of any manufacturing work, Allied claims that it had no obligation to make itself available to U.S. Steel to perform manufacturing work. But this

14

disregards the express language in the 2004 AIP that the $10 million advance payment was "[i]n consideration of [Allied]'s agreement to perform manufacturing work . . . under non-cancelable, long-term heavy industrial steel mill manufacturing contracts," and that "[u]ntil the recovery of the [$10 million] Advance Payment, each invoice for work performed under any of the Manufacturing Contracts shall be discounted by [Allied] to permit U.S. Steel to recover the [payment] over the 120-month term of this Agreement." These provisions make clear that Allied had the contractual duty to make manufacturing work available to U.S. Steel as an option for helping satisfy the $63 million profit-margin obligation. As a result of Allied's failure to fulfill its duty, U.S. Steel had no choice but to use Allied only for remedial work, despite having advanced $10 million for the express purpose of having Allied available to perform manufacturing work. Allied's repudiation of its promise to provide manufacturing work prevented U.S. Steel from receiving the benefit of its bargain. We therefore affirm the district court's grant of summary judgment in favor of U.S. Steel.

## IV

### U.S. Steel's Rule 59(e) Motion

The final issue is whether the district court erred in granting U.S. Steel's Rule 59(e) motion to alter or amend the judgment and thus erred in reducing Allied's damages on Count II to zero. In Count II, Allied sought breach-of-contract damages for U.S. Steel's failure to hire and compensate Allied for certain dismantling work in the basements of the Sheet & Tin Facility. Allied's position is that the work was part of the dismantling work to which Allied had exclusive rights under the 2003 AIP, but, because the work involved below-grade (that is, basement-level) dismantling, Allied was entitled to additional compensation for its completion. U.S. Steel agreed that Allied had the right (and indeed, the obligation) to do the work, but took the position that Allied was obligated to do it without any additional compensation. When Allied refused to do the

15

work without additional compensation, U.S. Steel hired a third party to do the work and then sought to charge Allied for the amount that it had paid the third party. Allied brought Count II against U.S. Steel for the compensation (and for the value of the scrap) that Allied would have received if U.S. Steel had hired Allied. U.S. Steel brought its first counterclaim against Allied for the monies paid to the third party. Both Allied's Count II and U.S. Steel's first counterclaim proceeded to jury trial.

Confusingly, the jury unanimously answered both of the following interrogatories on the verdict form in the affirmative:

1. Did Allied prove by the preponderance of the evidence that U.S. Steel breached the 2003 AlP and 2004 DSA by hiring another contractor to perform basement work that Allied should have been compensated to perform? (Check Yes or No.)

2. Did U.S. Steel prove by the preponderance of the evidence that Allied breached the 2003 AlP and 2004 DSA by refusing to perform basement work that it should have performed at no additional cost? (Check Yes or No.)

Following these answers, the jury awarded $694,067 to Allied for this breach by U.S. Steel and it awarded $0 to U.S. Steel for this breach by Allied.

The troubling part, of course, is that by answering "yes" to the first question, the jury was finding that Allied "should have been compensated" for the below-grade removal and backfilling. But by answering "yes" to the second question, the jury found that Allied "should have performed" such work "at no additional cost." Allied moved for a declaratory judgment in its favor based on the jury's verdict, and Allied addressed this apparent inconsistency in the verdict by asserting that the jury had found that Allied's breach was immaterial (hence the $0 award to U.S. Steel) whereas U.S. Steel's breach was material (thus justifying a damages award for Allied). U.S. Steel responded by pointing out, correctly, that the jury had been instructed to find *no* breach if a party's nonperformance was immaterial.

The court denied Allied's motion for the declaratory judgment, first determining that it was bound under the Seventh Amendment to consider "the jury's fact-findings and reasonable inferences drawn therefrom," and then concluding that regardless of the apparent inconsistency in the verdict, the jury had nevertheless found that Allied had breached by failing to perform the below-grade work at no cost, which precluded the court from entering a declaratory judgment in Allied's favor that Allied was entitled to compensation on such work.

Allied timely filed a notice of appeal. On the same day, U.S. Steel filed a Rule 59(e) motion to alter or amend the judgment on the grounds that Allied should not have been entitled to damages as to Count II when the jury found that Allied itself had breached the same agreements that U.S. Steel had breached. According to U.S. Steel, Pennsylvania law requires a plaintiff to "prove its own performance" in order to recover breach-of-contract damages from the defendant, and the jury's verdict made clear that Allied had materially breached (meaning that it had not so performed). Thus, U.S. Steel sought to reduce Allied's damages on Count II to zero.

The district court granted U.S. Steel's motion to alter or amend the judgment, concluding that under Pennsylvania law, given the jury's finding of mutual breach, Allied was not entitled to damages for U.S. Steel's breach as to Count II.

### A

Although we generally review the grant of a Rule 59(e) motion for abuse of discretion, we review the grant of such a motion de novo when the effect of the grant was to reverse judgment—that is, the effect is the same as if the district court had granted a renewed motion for judgment as a matter of law in favor of U.S. Steel after the return of a verdict in favor of Allied. *See Shelby Cty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 375 (6th Cir. 2009);

*cf. Johnson v. City of Memphis*, 617 F.3d 864, 867 (6th Cir. 2010) (applying de novo standard of review where Rule 59(e) motion sought review of the grant of summary judgment).

"The rule in Pennsylvania and elsewhere is that when parties to a contract each commit a material breach, the law will give relief to neither party." *Cottman Transmission Sys., Inc. v. Dubinsky*, 550 F. Supp. 133, 136 (W.D. Pa. 1982); *see also Evergreen Cmty. Power LLC v. Riggs Distler & Co., Inc.*, 513 F. App'x 236, 240 (3d Cir. 2013) ("When a party seeks to enforce a contract, or to recover damages for breach of contract, 'that party must prove that he has performed all of his own obligations under the contract.'" (citation omitted)); *U.S. ex rel Greenmoor, Inc. v. Travelers Cas. & Sur. Co. of Am.*, No. 06-cv-0234, 2009 WL 4730233, at *49 (W.D. Pa. Dec. 4, 2009) ("To establish a breach of contract under Pennsylvania law, . . . the party alleging breach must 'prove that he has performed all of his own obligations under the contract.'").

**B**

The jury was instructed to find that Allied had breached its contractual obligation to perform below-grade work "at no additional cost" to U.S. Steel only if Allied had materially breached. And the jury so found. Thus, although the jury verdict appears internally inconsistent to the extent that it also found U.S. Steel in breach of its agreement to pay Allied for the same work, Allied cannot show that, as a matter of law, the district court was incorrect to deny Allied's recovery. As U.S. Steel argues, if the jury intended to find that both Allied and U.S. Steel had materially breached the same agreement, then indeed the only inconsistency in the verdict is the monetary award to Allied, and the correct result was the district court's result: each party receives zero dollars in damages from the other for these breaches. Whether another result (such as further deliberation or a new trial) might have been preferable is neither here nor there,

for the parties contest only the district court's grant of U.S. Steel's Rule 59(e) motion. And that we affirm.

## V

In sum, for the reasons set forth above, we **REVERSE** as to Counts IV and V only, and we **AFFIRM** the district court in all other respects. Accordingly, we **REMAND** this matter for further proceedings consistent with this opinion.